Mario DI BELLA, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 349, Docket 26049.

United States Court of Appeals
Second Circuit.

Argued June 14, 1960.

Decided Nov. 23, 1960.

Waterman, Circuit Judge, dissented.

Jerome Lewis, for appellant.

Cornelius W. Wickersham, Jr., U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Joseph J. Marcheso, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before WATERMAN, MOORE and HAMLIN,* Circuit Judges.

HAMLIN, Circuit Judge.

Mario DiBella, appellant, appeals from an order of the District Court denying his motion to suppress certain evidenti-

* Of the Ninth Circuit, sitting by designation.

ary items seized in his apartment by agents of the Federal Bureau of Narcotics on March 9, 1959, at the time of his arrest. The motion was made after arrest and arraignment of appellant but before his indictment.

On November 30, 1959, subsequent to his indictment, the motion was denied by the District Court, with leave to renew it at the time of trial. On December 3, 1959, appellant gave notice of appeal to this Court from the order of the District Court. There has as yet been no trial of appellant.

Initially, the United States, appellee, raises the question as to whether such an order is appealable.

Over a period of many years this Court has consistently held that where the application is made prior to indictment, as it was in this case, that a defendant may appeal to this Court from an order denying his motion to suppress. United States v. Poller, 2 Cir., 1930, 43 F.2d 911, 74 A.L.R. 1382; Cheng Wai v. United States, 2 Cir., 1942, 125 F.2d 915; cf. United States v. Klapholz, 2 Cir., 1956, 230 F.2d 494; United States v. Russo, 2 Cir., 1957, 241 F.2d 285.

█ We hold the order made by the District Court in this case to be appealable.

The motion was argued before the District Court by counsel on either side and affidavits and counteraffidavits were presented for his consideration. From the showing there made, the following factual situation appeared. On October 15, 1958, one David W. Costa, a special agent of the Federal Bureau of Narcotics, presented to United States Commissioner Epstein in the Eastern District of New York a complaint praying for the arrest of appellant. This complaint stated:

"That upon information and belief, the defendants, Mario DiBella and Samuel Panzarella, did on September 10, 1958, at Jackson Heights, Long Island, New York * * * unlawfully sell, dispense and distribute a narcotic drug, to-wit: approximately one ounce of heroin hydrochloride, a derivative of opium, which said heroin hydrochloride was not in or from an original package bearing tax stamps required by law * * *.

"That the source of your deponent's information and the grounds for his belief are your deponent's personal observations in this case, the statements of Samuel Panzarella, and other witnesses in this case, and the reports and records of the Bureau of Narcotics."

Upon the basis of this complaint Commissioner Epstein issued a warrant of arrest.

On March 9, 1959, the narcotic agents saw appellant sitting in his living room in his apartment. At 8:15 p. m. Agent Costa, with the warrant of arrest in his possession, went with other agents to appellant's apartment. It was nighttime. The agents rang the bell and the door was opened by appellant's stepdaughter. The agents identified themselves, showed her their credentials, and walked into the living room, where they identified themselves to appellant, showed him a copy of the arrest warrant, and placed him under arrest. A quantity of narcotics was found, which, together with other items, the agents seized.[1]

---

1. The foregoing facts are undisputed. The only substantial conflict in the affidavits concerns the circumstances of the search. According to the affidavit of the Assistant United States Attorney the agents asked DiBella if he would permit them to make a search of the apartment. Appellant then told one of the agents "I know what you came for. I have all the stuff in a suitcase in the closet. There's no use tearing the place apart." Appellant then took the agents to his bedroom where a suitcase was found in the closet, and opened. It contained approximately a pound of heroin, a quantity of cocaine, and certain paraphernalia used to "cut" the narcotics. Appellant then stated that this was all the heroin he had in his possession. Approximately $8,675 was found in the apartment, and appellant later admitted that this money represented profits which he had made in the sale of narcotics. Appellant also later admitted that he had voluntarily

In Application of Fried, D.C., 68 F. Supp. 961, 964, consideration was given to the sufficiency of a complaint upon which a warrant of arrest was issued. There, the complaint, after alleging that the defendants had in their possession certain goods and chattels knowing the same to have been stolen, contained the following statement:

"The sources of deponent's information and the grounds of his belief are an investigation conducted by him in the course of his official duties."

The Court there held "Such a complaint will not support a warrant of arrest. United States v. McCunn, D.C.S.D.N.Y., 1930, 40 F.2d 295; United States ex rel. King v. Gokey, D.C.N.D.N.Y., 1929, 32 F.2d 793; * * * United States v. Pollack, D.C.N.J., 1946, 64 F.Supp. 554; United States v. Ruroede, D.C.S.D.N.Y., 220 F. 210."

Recently the question of the sufficiency of a complaint to justify a warrant of arrest was considered in Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 1247, 2 L.Ed.2d 1503.

The complaint in that case read as follows:

"The undersigned complainant being duly sworn states: That on or about January 26, 1956, at Houston, Texas * * *, Veto Giordenello did receive, conceal, etc., narcotic drugs, to-wit: heroin hydrochloride with knowledge of unlawful importation; * * *

"And the complainant further states that he believes that ........

... are material witnesses in relation to this charge."

In striking down the complaint as insufficient in that case, the Court said:

"The complaint contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made."

The Court further said:

"Criminal Rules 3 and 4 provide that an arrest warrant shall be issued only upon a written and sworn complaint (1) setting forth 'the essential facts constituting the offense charged,' and (2) showing 'that there is probable cause to believe that [such] an offense has been committed and that the defendant has committed it * * *.' The provisions of these Rules must be read in light of the constitutional requirements they implement. The language of the Fourth Amendment, that '* * * no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing * * *. the persons or things to be seized * *,' of course applies to arrest as well as search warrants."

█ We hold that the complaint upon which the warrant of arrest was based was deficient in this case, and would not support the warrant of arrest which was

turned over the seized heroin to the agents at the time that they visited his apartment to arrest him.

An affidavit filed by DiBella's counsel presents a different version of the events following DiBella's arrest. According to this affidavit "About six agents remained in the living room with him and four others searched his apartment. He never consented to the search. He never left the living room. He never gave heroin nor money to the agents."

DiBella's affidavit is not contrary to either of the above affidavits but merely states that the agents, after exhibiting to him the warrant for his arrest, "proceeded to make a general exploratory examination of my apartment. They discovered a quantity of narcotics in my apartment and seized said narcotics and in addition thereto a suitcase, miscellaneous papers, my passport and divers other items."

Under either version it does not appear that the search of appellant's apartment was an unreasonable one.

issued under it. It is particularly deficient in setting forth the sources of his information or grounds for his belief. True, it recites that his belief an offense had been committed was grounded on his "personal observations in this case, the statements of Samuel Panzarella, and other witnesses in this case, and the reports and records of the Bureau of Narcotics," but what other sources could there possibly be? Such a shotgun, all-encompassing enumeration is no better than none at all. There is no indication of what he had personally observed, what he had heard from others or what he learned from the reports and records of the Bureau of Narcotics. Neither is there presented the basis for crediting the hearsay of the nameless "other witnesses" or the unidentified "reports and records." The complaint is no better than that in Giordenello v. United States, and the warrant is invalid for the same reasons.

Appellee, however, contended in the court below (as it contends here) that regardless of any objection of appellant that the warrant of arrest was improperly issued, that Agent Costa had probable cause to effect a valid arrest of appellant under the authority of 26 U.S.C. § 7607, which states that, among others, agents of the Bureau of Narcotics may:

> "(2) Make arrests without warrant for violations of any law of the United States relating to narcotic drugs (as defined in section 4731) or marihuana (as defined in section 4761) where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The District Court, in its opinion agreeing with the position of appellee, stated [178 F.Supp. 7]: "However, quite apart from the question of the propriety of the issuance of the warrant, Agent Costa had grounds for believing that DiBella had committed a violation of the Narcotics Acts sufficiently reasonable to justify his arrest without a warrant." To properly evaluate this contention, we shall examine some of the further facts that were presented upon the hearing to the District Judge.

It appears that on October 6, 1958, Agent Costa and another agent, one Daniel D. Moynihan, in an endeavor to obtain a search warrant each signed and presented to United States Commissioner Abruzzo an affidavit which set forth the knowledge each agent had from personal observation and from information received, concerning the activities of appellant in connection with possession and sale of narcotics.

These affidavits set forth in detail certain events occurring on August 26, 1958, and on September 10, 1958, from which it could be inferred that there was a sale of narcotics on each of those two occasions by appellant to the narcotics agents through one Panzarella. These affidavits are set out in full in a footnote.[2]

2. [Affidavit of David W. Costa] Eastern District of New York, *ss.*:

David W. Costa being duly sworn deposes and says that your deponent is an agent of the Bureau of Narcotics, District No. 2, and that he has been assigned since the latter part of July, 1958, together with Daniel D. Moynihan, an agent of the Bureau of Narcotics, to investigate the possible sale and possession of narcotics in the area of Jackson Heights, Queens, within the Eastern District of New York.

That he has reason to believe that on the premises known as Apt. 42, 35–15 80th Street, Jackson Heights, Queens, New York, within the Eastern District of New York, being a 5 room apartment leased to one Mario DiBella, that there is now being concealed a quantity of narcotic drugs, namely heroin hydrochloride, a derivative of opium, which are contraband held in violation of law for the purpose of sale not from the original stamped packages and not pursuant to any written order form in violation of the provisions of the Internal Revenue Tax Laws.

That the facts tending to establish the grounds for the issuance of a search warrant are as follows:

Upon information and belief, Mario

A search warrant was not issued by United States Commissioner Abruzzo, to whom the affidavits were presented, but the affidavits were presented to the District Judge for his consideration on the instant motion to suppress.

DiBella rents apartment #42 at 35–15 80th Street, Jackson Heights, Queens, New York.

At 7:30 A.M. on August 26, 1958, I observed Mario DiBella leave the premises at 35–15 80th Street, Jackson Heights, Long Island, New York. DiBella walked to the street and entered his Chrysler automobile New York License No. 6971NE. DiBella drove to 37th Avenue and 79th Street, Jackson Heights, where he met one Sammy Panzarella, who entered the Chrysler automobile driven by DiBella. The two men drove to Roosevelt Avenue and 79th Street where Panzarella left the car. I observed Panzarella walk to 78th Street, where, upon meeting Agent Moynihan, Panzarella handed a small envelope to him. Later tests showed that this envelope contained heroin hydrochloride.

A second purchase of heroin from Panzarella was arranged by Agent Moynihan to be effected September 10, 1958.

At 11:00 P.M. September 10, 1958, I observed Mario DiBella leave Apartment #42 at 35–15 80th Street, Jackson Heights, New York and walk to Roosevelt Avenue and 74th Street where he met Panzarella. DiBella and Panzarella then walked to 76th Street near Roosevelt Avenue, where they parted company. Panzarella then met Agent Moynihan and sold him an ounce of heroin hydrochloride, which he claimed he had obtained from DiBella.

Upon information and belief, Mario DiBella has been a source of supply of heroin hydrochloride to Samuel Panzarella over a period of years; that on each of the two occasions described above, Mario DiBella left his apartment #42 35–15 80th Street, Jackson Heights, New York and proceeded directly to meet Samuel Panzarella; that Samuel Panzarella then proceeded directly to Agent Moynihan and sold him a quantity of heroin hydrochloride.

That the source of your deponent's information and the grounds for his belief are the investigation and reports of Agents of the Bureau of Narcotics; the statements of Samuel Panzarella and other witnesses and your deponent's personal investigation in this case.

**Wherefore**, your deponent respectfully requests that a night time search warrant issue for the premises described above.

(Sworn to by David W. Costa
on October 6, 1958.)

**[Affidavit of Daniel D. Moynihan]**
Eastern District of New York, *ss.*:

**Daniel D. Moynihan** being duly sworn deposes and says that your deponent is an agent of the Bureau of Narcotics, District No. 2, and that he has been assigned since the latter part of July, 1958, together with David W. Costa, an agent of the Bureau of Narcotics, to investigate the possible sale and possession of narcotics in the area of Jackson Heights, Queens, within the Eastern District of New York.

That he has reason to believe that on the premises known as Apt. 42, 35–15 80th Street, Jackson Heights, Queens, New York, within the Eastern District of New York, being a 5 room apartment leased to one Mario DiBella, that there is now being concealed a quantity of narcotic drugs, namely: heroin hydrochloride, a derivative of opium, which are contraband held in violation of law for the purpose of sale and that these drugs are not from the original stamped packages and not pursuant to any written order form, in violation of the provisions of the Internal Revenue Tax Laws.

The facts tending to establish the grounds for the issuance of a search warrant are as follows:

Your deponent met one Samuel Panzarella who offered to sell heroin to your deponent. At the time of the meeting, Samuel Panzarella and your deponent agreed to effect the sale of heroin to your deponent, this sale to be made on August 26, 1958 at 8 o'clock in the morning. At six o'clock in the morning on August 26, 1958, your deponent met Samuel Panzarella in Manhattan. Samuel Panzarella stated that he wished to telephone his source of supply of heroin, and he thereupon made a telephone call. After the telephone call was completed, Samuel Panzarella stated to your deponent that delivery of the heroin would be made to your deponent at 8:30 A.M. that morning.

Your deponent then drove with Samuel Panzarella to Jackson Heights, Long Island and parked on 79th Street, north of Roosevelt Avenue. Samuel Panzarella left the vehicle at about 7:30 A.M. that morning and your deponent observed him walk to 79th Street and 37th Avenue and enter a green Chrysler, New York license #6971NE. Your deponent observed Samuel Panzarella leave that Chrysler several minutes later at 79th Street and Roosevelt Avenue. Samuel

In Draper v. United States, 358 U.S. 307, at page 310, 79 S.Ct. 329, at pages 331, 332, 3 L.Ed.2d 327, it was held that where a narcotic agent had "probable cause" within the meaning of the Fourth Amendment and "reasonable grounds" within the meaning of the Narcotic Control Act to believe that a person had committed or was committing a violation of the narcotics laws, he could make a lawful arrest. The Court there said, quoting Brinegar v. United States, 338 U.S. 160, 172–173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879:

"'There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them.'"

Panzarella then returned to the vehicle used by your deponent, and at 8:05 A.M. that morning Samuel Panzarella handed your deponent a glassine envelope containing a white powder which subsequent tests proved to be an ounce of heroin hydrochloride.

A similar pattern of events followed on September 10, 1958. At 9:30 in the evening of September 10, 1958, Samuel Panzarella and your deponent met in Manhattan, where Samuel Panzarella offered to sell your deponent another ounce of heroin. Samuel Panzarella stated that it would again be necessary to go to Jackson Heights to meet his "connection," and then he would telephone his "connection." Panzarella then made a telephone call at 9:40 P.M. on September 10, 1958. Your deponent and Samuel Panzarella went to 74th Street and Roosevelt Avenue, Jackson Heights, Long Island, New York. At 11:05 P.M. Samuel Panzarella left your deponent. Your deponent observed him meet Mario DiBella a few minutes later, and saw Mario DiBella walk with Samuel Panzarella from 74th Street to 37th Road. Samuel Panzarella returned to your deponent at 11:20 P.M. and your deponent and Samuel Panzarella then drove to New York City. Enroute, Samuel Panzarella handed a glassine envelope containing a white powder to your deponent, which powder was tested and found to be heroin hydrochloride.

At page 313 of 358 U.S., at page 333 of 79 S.Ct., the Court said:

"'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, supra [338 U.S. at [page] 175 [69 S.Ct. at page 1310]. Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543]."

Samuel Panzarella stated that DiBella was his source of supply of heroin and that DiBella had supplied the heroin sold to your deponent on September 10, 1958 and August 26, 1958.

No tax stamps were seen by your deponent on either of the glassine envelopes received from Samuel Panzarella on September 10, or August 26, 1958, nor was the sale of these two packages pursuant to a written order form.

Upon information and belief, Mario DiBella left his apartment #42 35–15 80th Street, Jackson Heights, New York on each of the two occasions described above and met Samuel Panzarella directly thereafter; that Samuel Panzarella then directly proceeded to meet your deponent and the sale of heroin was effected; that Mario DiBella has been a source of supply of illegal heroin hydrochloride for an extended period.

That the source of your deponent's information and the grounds for his belief are the statements made by Samuel Panzarella, the observations and investigation of other narcotic agents and your deponent's personal investigation in this case.

**Wherefore,** your deponent respectfully requests that a night time search warrant issue for the premises described above.

(Sworn to by Daniel D. Moynihan on October 6, 1958.)

In the present case, Costa had not only the benefit of his own observations of the contacts and activities of appellant and Panzarella, but he also had the benefit of the information given him by Agent Moynihan as to the sales of heroin by Panzarella to Moynihan.

An examination of the affidavits of Agents Moynihan and Costa shows that both on August 26, 1958, and on September 10, 1958, appellant and Panzarella were under the surveillance of each agent. On August 26, for instance, Panzarella agreed to sell Moynihan heroin, and stated that he had to contact his connection. He made a telephone call and then went with Agent Moynihan to 79th Street near Roosevelt Avenue in Jackson Heights. Moynihan saw Panzarella leave his vehicle, walk to 79th Street and 37th Avenue, and enter a green Chrysler automobile with New York license No. 6971NE. Moynihan saw Panzarella leave the Chrysler a few minutes later at 79th Street and Roosevelt Avenue, and saw Panzarella return to his vehicle, upon which Panzarella handed to Moynihan the envelope which proved to contain heroin. At the same time, Costa saw appellant enter the same Chrysler automobile and saw him drive to 37th Avenue and 79th Street, saw him meet Panzarella who then entered the Chrysler automobile. He saw the two men drive to 79th Street and Roosevelt Avenue and saw Panzarella leave the automobile. Costa then saw Panzarella walk to 78th Street and meet Agent Moynihan and hand a small envelope to him. The later tests showed that this envelope contained heroin.

Likewise, on September 10, 1958, each agent saw approximately the same procedure followed between Panzarella and appellant. On the latter occasion, Panzarella, after being in contact with appellant, came back to Moynihan and sold him an ounce of heroin which he told Moynihan he obtained from DiBella. Appellant was seen meeting Panzarella, be with him briefly, and Panzarella was seen to immediately return to Moynihan with the heroin.

Taking all of the circumstances together, we believe that there was ample evidence to hold that Costa had "reasonable grounds to believe" that appellant had committed a violation of the narcotics laws. With all the information Costa had, both from his own observation and from information received from Moynihan, Costa would have indeed been naive if he did not believe that appellant had just provided the narcotics which Panzarella delivered to Moynihan. Although Costa's affidavit was based in part on hearsay, there was "a substantial basis for crediting" the information given him by a fellow-agent, information which was wholly consistent with what Costa himself had observed. Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697. We hold that at any time after September 10, 1958, Costa had reasonable grounds to believe that DiBella had committed a violation of the narcotics laws.

Appellant contends, however, that the delay from September, 1958, until March, 1959, when the arrest was made, was sufficient to say that in March, 1959, Costa did not have reasonable grounds to believe that DiBella had committed a narcotics violation. We cannot so hold.

An explanation was given by appellee that the delay was occasioned by a desire on the part of the agents to uncover further violations. Be that as it may, we do not believe that the delay eradicated from Costa's mind the knowledge that he had received by September, 1958, of appellant's apparent violations of the narcotics laws.

When appellant was arrested on March 9, 1959, Costa had in his possession the warrant of arrest which had been issued October 15, 1958, and after arresting appellant under color of this warrant, which we have held to have been invalidly issued, made a return on it showing that he had executed the warrant by arresting DiBella on the 9th day of March, 1959.

We do not believe that this helps appellant. Although Costa apparently believed that this warrant was a valid

one, yet, even though it was not, the arrest may be justified on the ground that Costa had reasonable grounds to believe that DiBella had committed a narcotics violation.

In Williams v. United States, 9 Cir., 273 F.2d 781, the arrest was made upon a warrant of arrest which the Court held to be invalid. However, the arrest was justified on the basis of the arresting officer having reasonable grounds to believe a violation had been committed.

In Giordenello v. United States, supra, the Supreme Court held that the warrant of arrest was invalid. The case points out, however, that in the Supreme Court, for the first time, the Government contended that the arrest could be justified without a warrant on the basis that there was probable cause to believe that the person arrested had committed a felony. The Supreme Court held that these contentions by the Government, having been made for the first time before that Court, were belated, and refused to consider them. The case was reversed, but the Supreme Court stated:

> "This is not to say, however, that in the event of a new trial the Government may not seek to justify petitioner's arrest without relying upon the warrant." [357 U.S. at page 488, 78 S.Ct. at page 1251.]

The arrest of DiBella by Costa, who, on March 9, 1959, had reasonable grounds to believe DiBella had committed a violation of the narcotics law, was a lawful arrest. The arrest being lawful, a reasonable search of appellant's premises, such as shown in this case, was proper. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

Judgment affirmed.

WATERMAN, Circuit Judge (dissenting).

I concur in the holding that, inasmuch as the motion was made prior to indictment, the denial of the motion to suppress is an appealable order. I also agree with my colleagues that the warrant of arrest is invalid under Giordenello v. United States, 1958, 357 U.S. 480, 78 S. Ct. 1245, 2 L.Ed.2d 1503 and earlier cases. However, I am unconvinced that Agent Costa had "reasonable grounds" for arresting DiBella without possessing a valid warrant for his arrest. Therefore, I would hold that the subsequent search of the DiBella home cannot be justified as incidental to DiBella's lawful arrest. Moreover, even assuming arguendo that the arrest was a lawful one, I disagree with the conclusion the majority reach that the subsequent search is justifiable as incidental to the arrest.

As the majority opinion sets forth, the "reasonable grounds" contemplated by the Narcotics Control Act, 26 U.S.C. § 7607, are equivalent to the "probable cause" required under the Fourth Amendment, Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327, and the quantity and quality of the evidence to substantiate "probable cause" need not be as great as that required for a determination of guilt. Jones v. United States, 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697; Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134; Draper v. United States, supra, Brinegar v. United States, 1949, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

In determining whether a law enforcement officer had "reasonable grounds" (i. e. "probable cause") to act as he did, we should approach a resolution of the issues in the light of the historical interpretation this language of the Fourth Amendment has been accorded in the past. And, of course, we should look at the occurrence we are examining with the greater particularity when, as here, the officer, unprotected by a prior valid judicial act, invades a family's permanent domicile in the night-time.

The latest of the several Supreme Court summaries setting forth the philosphy underlying the meaning of "upon probable cause" and an historical ex-

emplification of that philosophy appears in Henry v. United States, supra. There Justice Douglas states, 361 U.S. 98, 101, 80 S.Ct. 168, 170:

> "And as the early American decisions both before and immediately after its [the Fourth Amendment] adoption show, common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest. And that principle has survived to this day [citing cases]. Its highwater was Johnson v. United States, supra [1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436], where the smell of opium coming from a closed room was not enough to support an arrest and search without a warrant."

There have been cases where the Supreme Court has gone to some lengths to find probable cause, but I find none where the Court has justified an arrest without an arrest warrant, or approved a search without a search warrant, where the evidence of probable cause was as flimsy and as unconvincing as it is in the instant case.

The Carroll and Brinegar cases, supra, dealt with violations of the federal liquor laws. Defendants in each case were arrested on the open road while transporting liquor. In each case the arresting officer had observed the defendant at some length and could attest personally to the defendant's having handled liquor. Defendants in Carroll had offered the officer alcohol on a previous occasion. Brinegar previously had been arrested by the same officer for illegally transporting liquor, and in the six months preceding the arrest at issue that officer had twice seen the defendant loading liquor into a car or truck.

Draper v. United States, supra, dealt with the specific section of the Narcotics Control Act here involved. There the arresting officer had information from a paid "special employee" of the Bureau of Narcotics that Draper was peddling narcotics and would arrive in Denver by train carrying a shipment of narcotics. Draper was arrested as he alighted from the train.

In Jones v. United States, supra, the question of whether the magistrate who issued a warrant had sufficient competent evidence before him in the officer's affidavit to justify issuance was decided favorably to the Government. Probable cause was there found because the officer's affidavit not only set forth information given by an unnamed informer but also stated that the officer personally knew the persons informed upon, and knew they were narcotics users. Furthermore, the informer had given reliable information in the past and the information given this time was corroborated by other informants. See 362 U.S. 267, footnote 2, 80 S.Ct. 734, footnote 2.

What evidence is offered in this case to justify a judicial finding that Agent Costa had "reasonable grounds" (i. e., "probable cause") to arrest DiBella without a warrant? Agent Costa had been told of a statement by one Panzarella, a narcotics peddler, to a fellow-agent, Moynihan, a purchaser, that DiBella was Panzarella's source of supply. The only evidence corroborating this hearsay was the fact that Costa had observed that prior to each of two sales DiBella and Panzarella had met in a car. Costa did not observe any transfer of anything between the two men. On the basis of this evidence Moynihan and Costa on October 6, 1958 applied for a warrant to search DiBella's apartment. U. S. Commissioner Abruzzo denied the application. On October 15, 1958 a defective arrest warrant was issued. On March 9, 1959 DiBella was arrested by three agents in the evening as he was sitting in his living room. It is claimed that during this five months' period the agents were awaiting expected additional violations, but Agent Costa could not point to a single incident in that five months' period which added to the evidence presented to Commissioner Abruzzo and from which Commissioner Abruzzo could not find probable cause to issue a search warrant.

Draper, Brinegar and Carroll were arrested when there was a real need for rapid action but even in those cases more evidence justifying arrest was introduced than here. In Brinegar and Carroll additional evidence was compiled during the period of surveillance. Here no such evidence was accumulated, and the informer Panzarella was something less than the trustworthy "special employee" in Draper. This case is perhaps closest to Jones, but even there more corroborating evidence was introduced, and the initial invasion of the privacy of the apartment where Jones was discovered was pursuant to a valid search warrant issued by "an independent judicial officer."

It is interesting to compare the facts in the instant case with those in Henry v. United States, supra, in which the Supreme Court refused to find probable cause. In Henry the arrest followed surveillance by two FBI officers. Henry and a confederate had been seen making two trips transporting cartons in an automobile from a residential section of the city to a tavern. The FBI had developed an interest in Henry because the confederate had been "implicated in interstate shipments" and in that area there had been some whiskey stolen from an interstate shipment. Henry and his confederate were stopped during the second trip and were found to be carrying stolen radios in their car. The Supreme Court reasoned that using an auto to transport small cartons was an outwardly innocent activity, and the FBI agents could not rely in justification for their acts upon an informer's story to them that Henry's confederate was implicated in a former theft of an interstate shipment. DiBella's two meetings with Panzarella were to all outward appearances a more innocent association than the two trips Henry and his confederate were making. No invasion of one's domicile was involved in Henry, and the Court recognized that "Carroll v. United States, supra, liberalized the rule governing searches when a moving vehicle is involved." But even under these circumstances the Court went on to say, "But that decision [Carroll] merely relaxed the requirements for a warrant on grounds of *practicality*. It did not dispense with the need for probable cause." (Emphasis supplied.) 361 U.S. 98, 104, 80 S.Ct. 168, 172. Accord, Rios v. United States, 1960, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688. See Eng Fung Jem v. United States, 9 Cir., 1960, 281 F.2d 803. Moreover, in cases where arrests without warrant have been sought to be justified as having been made upon probable cause the Courts of Appeal have felt constrained to discover special circumstances to justify the arrests. See United States v. Kancso, 2 Cir., 1958, 252 F.2d 220, 224; United States v. Volkell, 2 Cir., 251 F.2d 333, 336, certiorari denied 1958, 356 U.S. 962, 78 S.Ct. 1000, 2 L.Ed.2d 1068; United States v. Walker, 7 Cir., 1957, 246 F.2d 519, 527. See also Williams v. United States, 9 Cir., 273 F.2d 781, 791, certiorari denied 1960, 362 U.S. 951, 80 S.Ct. 862, 4 L.Ed.2d 868 (informer was paid employee), relied on by the majority here.

The events which the majority hold gave rise to a reasonable belief that the appellant was guilty of a crime under the narcotics laws on March 9, 1959 occurred in August and September of 1958. This fact casts further doubt on the validity of the majority holding here that the officers had probable cause at 8:15 P.M. on March 9, 1959 to believe that DiBella had committed a narcotics crime recently enough, or was at that moment committing one, so as to justify the warrantless arrest. It is true enough that in cases where the officer has been armed with a valid arrest warrant the rule appears to be that the warrant need not be executed at the first opportunity. But, on the other hand, execution should not be unreasonably delayed. United States v. Joines, 3 Cir., 258 F.2d 471, certiorari denied 1958, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109. The unreasonableness of a delay would depend upon the circumstances present in the particular situation, but thus far no case has been called to my attention, and I have

not discovered any, where the courts have approved as reasonable an interval longer than a month between the issuance and the execution of the warrant where there has been opportunity in the meantime to make the arrest. See United States v. Joines, supra (21 days); Seymour v. United States, 1949, 85 U.S. App.D.C. 366, 177 F.2d 732 (6 days); State v. Kopelow, 1927, 126 Me. 384, 138 A. 625 (7 days); State v. Nadeau, 1903, 97 Me. 275, 54 A. 725 (23 days); Kent v. Miles, 1897, 69 Vt. 379, 37 A. 1115 (17 days). The permissible interval between the events giving rise to a narcotic agent's reasonable grounds to believe that a person has committed or is committing a narcotics crime and the agent's actual arrest of such a person was considered by the Fifth Circuit in Dailey v. United States, 5 Cir., 1958, 261 F.2d 870, 872, certiorari denied 1959, 359 U.S. 969, 79 S.Ct. 881, 3 L.Ed.2d 836 the court stating that the arresting officer "may defer the arrest for a day, a week, two weeks, or perhaps longer." Surely in the present case where no new evidence was uncovered during the entire period of five months to justify the delayed arrest, we are faced with a very stale "probable cause". I would hold that the arrest of a person who has been under surveillance for seven months—an arrest that is made by an officer not possessed of a valid arrest warrant but which the officer seeks to justify by events that occurred five months before—is not a lawful arrest. The majority find that the knowledge the officers possessed on October 6, 1958 makes the March 9, 1959 arrest lawful, and the subsequent search lawful. This is the identical knowledge that Commissioner Abruzzo on October 6, 1958 found insufficient to justify the issuance of a warrant to search those very premises at a time when the information was not stale.

However, assuming that the officers had probable cause to arrest DiBella the search of his home cannot even then be justified. The mere fact that a search immediately follows a valid arrest does not conclusively establish the reasonableness of that search. Abel v. United States, 1960, 362 U.S. 217, 235, 80 S. Ct. 683, 695, 4 L.Ed.2d 668; United States v. Rabinowitz, 1950, 339 U.S. 56, 65–66, 70 S.Ct. 430, 94 L.Ed. 653. See Rios v. United States, supra, 364 U.S. at page 261, 80 S.Ct. at page 1436. A long and inconsistent series of cases has attempted to define the permissive area of a valid search incidental to an arrest. But as Justice Frankfurter pointed out this year in Abel:

"The several cases on this subject in this Court cannot be satisfactorily reconciled. This problem has, as is well-known, provoked strong and fluctuating differences of view on the Court. This is not the occasion to attempt to reconcile all the decisions, or to re-examine them. Compare Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, with Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374, and United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, compare Go-Bart, supra, and Lefkowitz, supra, with Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; compare also Harris, supra, with Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, and Trupiano with Rabinowitz, supra (overruling Trupiano). Of these cases, Harris and Rabinowitz set by far the most permissive limits upon searches incidental to lawful arrests." 362 U.S. at page 235, 80 S.Ct. at page 695.

Although Justice Frankfurter, in Abel, was unwilling to attempt a reconciliation of the cases, he had on two prior occasions analyzed in detail the decisions involving searches and seizures incidental to arrests. Harris v. United States, 1947, 331 U.S. 145, 155–183, 67 S.Ct. 1098, 91 L.Ed. 1399 (dissent); United States v. Rabinowitz, supra, 339 U.S. at pages 68–86, 70 S.Ct. at pages 436–444 (dissent). From his analysis we can

discern a pattern that has eroded the homeowner's right to personal privacy in his dwelling to the point where it would seem that the entire home is subject to search by the police if armed with a valid warrant for the homeowner's arrest. Harris v. United States, supra. Trupiano v. United States, supra, restricted Harris by pointing out that such a broad search without a search warrant could only be condoned as incidental to a lawful arrest where there was a practical necessity for speed. The need for this showing was later rejected in United States v. Rabinowitz, supra. Therefore, now, as a result of this steady erosion, on the authority of Harris, as resurrected by Rabinowitz, a prisoner's apartment may be lawfully searched without a search warrant as incidental to his lawful arrest, unless the prisoner's situation is meaningfully distinguishable from that present in those cases.

Two factors distinguish the instant case. First, in Harris and Rabinowitz a *valid* warrant of arrest had been issued. Thus there had been a proper decision by a disinterested magistrate that probable cause of guilt existed. No valid warrant issued here. There is no Supreme Court case upholding the officers' acts where a home was searched by officers armed with neither an arrest warrant nor a search warrant. Draper v. United States, supra, involved the search of a prisoner's person; Brinegar and Carroll the search of the prisoners' automobiles. It is certainly clear that "There is a vast difference between entering and searching homes or even hotel rooms which are fixed and more or less permanent locations and stopping a person or car on a highway for the same purpose. A warrant can usually be obtained in the first situation without too much risk that the object of the search will disappear." United States v. Kancso, 2 Cir., 1958, 252 F.2d 220, 223, 224.

As Justice Douglas speaking for the Court has said:

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." McDonald v. United States, 1958, 335 U.S. 451, 455–456, 69 S. Ct. 191, 193, 93 L.Ed. 153.

Second, in further contrast to Harris and Rabinowitz, DiBella's arrest and the subsequent search of his residence occurred in the night-time. Rule 41(c) of the Federal Rules of Criminal Procedure, 18 U.S.C., provides that a search warrant shall be restricted to daytime execution unless the affidavit indicates positively that the objects to be seized are upon the premises. See also Distefano v. United States, 5 Cir., 1932, 58 F.2d 963. In Jones v. United States, 1958, 357 U.S. 493, 498–499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, the Supreme Court stated, by Justice Harlan, that the provisions relative to night-time search in Rule 41 (c) are "hardly compatible with a principle that a search without a warrant can be based merely upon probable cause." To be sure, the probable cause the Court was there discussing was probable cause for the existence of objects of seizure

rather than probable cause to justify an arrest. But I see no difference in principle between the two situations.

Thus, it is clear that the majority is not merely applying the rationale of Harris and Rabinowitz, but is amplifying and extending the doctrine of those cases. Furthermore, the fact that the search uncovered narcotics cannot change the result, for "a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." United States v. Di Re, 1948, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210. Nor do I find persuasive the argument that such searches are necessary for the effective control of narcotics traffic. Justice Jackson, speaking for the Court, disposed of this argument in United States v. Di Re, supra, 332 U.S. at page 595, 68 S.Ct. at page 229:

> "We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them. The conviction based on evidence so obtained cannot stand."

And as Justice Douglas said in his dissent in Draper v. United States, supra, 358 U.S. at pages 314–315, 79 S.Ct. at page 333:

> "Decisions under the Fourth Amendment, taken in the long view, have not given the protection to the citizen which the letter and spirit of the Amendment would seem to require. One reason, I think, is that wherever a culprit is caught redhanded, as in leading Fourth Amendment cases, it is difficult to adopt and enforce a rule that would turn him loose. A rule protective of law-abiding citizens is not apt to flourish where its advocates are usually criminals. Yet the rule we fashion is for the innocent and guilty alike. If the word of the informer on which the present arrest was made is sufficient to make the arrest legal, his word would also protect the police who, acting on it, hauled the innocent citizen off to jail."

Appellant DiBella was sitting in his living room one night when Agent Costa together with other agents entered and arrested him on the most specious of stale grounds. This arrest then became the basis of an exhaustive search of appellant's home.[1] To condone such activity "is to make the arrest an incident to an unwarranted search instead of a warrantless search an incident to an arrest." United States v. Rabinowitz, supra, 339 U.S. at page 80, 70 S.Ct. at page 441 (Frankfurter, J., dissenting). To approve the officers' acts here is to take another long step away from the original concepts of ordered liberty expressed in the Fourth Amendment. I would suppress the evidentiary material seized by the agents.

---

1. There is no agreement as to the number of agents who participated in the arrest and search. But there were at least five. The government affidavit admits to five, and identifies these five by name. Two of them accompanied Costa at the time of the initial entry. Two more then joined these three when the search began. I suggest that this was more than enough manpower to make the simple arrest and that the agents' real purpose in entering DiBella's apartment was to conduct a search there without first applying for and obtaining a search warrant.