**UNITED STATES of America, Appellee,**

v.

**Frank Warren PRICE and William Riley, Defendants-Appellants.**

**No. 222, Docket 29123.**

United States Court of Appeals Second Circuit.

Argued Nov. 10, 1964.

Decided May 17, 1965.

Waterman, Circuit Judge, dissented.

District of New York, Brooklyn, N. Y., on the brief), for appellee.

Gretchen White Oberman, New York City (Anthony F. Marra, New York City, on the brief), for defendants-appellants.

Before SWAN, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Frank Price and William Riley were indicted for possessing an unregistered still, 26 U.S.C.A. § 5179(a), fermenting mash for alcohol in an unauthorized distillery, 26 U.S.C.A. § 5222(a) (1), carrying on a distillery business without the required bond, 26 U.S.C.A. § 5173(a), (b), and conspiring to violate all of the above laws, 18 U.S.C.A. § 371. After a nonjury trial before Judge Rayfiel, they were both convicted and sentenced to 30 days' imprisonment on each count, to run concurrently.

On this appeal Price and Riley raise no question as to the sufficiency of the evidence. Rather, they claim that certain items of evidence were inadmissible and should have been suppressed either on their motion to suppress, decided after a hearing by Judge Dooling (unreported), or on trial. They argue that this evidence was the result of an unlawful search and seizure, that Price's arrest was invalid, and that certain admissions were tainted by these infirmities and by unnecessary delay in arraignment. The material facts are not in dispute.

The Alcohol and Tobacco Tax Unit (ATTU) received a tip from an informer that an illegal still was being operated at 146–12 106th Avenue in Jamaica, New York. Shortly thereafter federal officers began surveillance of that building from a school across the street. A few days later officers LaPerch, Boylan and Ginley, who had begun watching in late afternoon, at 8:30 in the evening saw a man carrying a heavy-looking package leave No. 146–12. The officers tried to follow, but they lost him. He returned at 10:00 P.M. At 10:30 P.M. he left again carrying a similar heavy-looking package. The officers again followed him. He

Leonard J. Theberge, Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty. for Eastern

saw them, started to run, threw down the package, and fell down. Boylan smelled and tasted the contents, some of which remained in the broken fragments of a bottle that had been in the package. He determined the liquid to be corn whiskey. The bottle had no stamp tax affixed. LaPerch, after tasting and smelling the contents, verified Boylan's conclusion. The officers arrested the man, who identified himself as Riley. Riley first said that he obtained the whiskey from a man on the corner. LaPerch then told him, "Don't lie to us. You don't have to tell us, but if you do, we can use it against you. We were watching you." [1] Riley thereupon said he obtained the whiskey from a man on the second floor of No. 146–12, and he agreed to take the officers there.

After entering the common entranceway on the ground floor, through the unlocked door, the officers noticed heat and the smell of mash, both of which increased as they climbed the stairs. LaPerch approached the rear apartment on the second floor and saw a woman standing in the hall before the fully opened door of the apartment. From the hall could be seen a sheet hanging over a doorway off the parlor. LaPerch asked the woman where the still was and she stepped back, saying nothing. LaPerch and Ginley passed her and entered through the open door into the parlor. Not finding the man they walked through the sheeted door, which led to the kitchen. A 50-gallon still was operating there and many one-gallon bottles were evident— some apparently with whiskey and some without. Boylan and Riley were let in through a kitchen door, and Boylan heard a noise in a room off the kitchen. Under a blanket he found a man who said that he was Price, that he lived there, and that he owned the still. Price was then arrested; the time was about 11:00 P.M.

The agents took samples from the still and seized some components. They then destroyed the still. This took about an hour. Price and Riley were then taken to a local police precinct where they remained for an hour. They were not questioned. The next hour or so was taken up driving to Manhattan. Prior to being lodged overnight at the Federal House of Detention they were taken to the ATTU office for routine processing. Price there made a statement which took almost an hour to record and type. He signed it at about 4:30 A.M. During these hours Price and Riley seem to have been asked some questions sporadically, but had not at all been subjected to constant interrogation. About 10:00 A.M. the next day they were taken to the United States Court House where an Assistant U. S. Attorney drew up the complaint to be used before the Commissioner. During the part of an hour it took to dictate and type the complaint Riley was asked a few questions. He was advised of his Constitutional right to remain silent, and he neither requested nor was denied the opportunity to consult with counsel. • He then confessed orally that he and Price were partners in running the still. Then, at 11:00 A.M. they were arraigned.

I.

■ An ATTU officer may "make arrests without warrant for any offense against the United States relating to the internal revenue laws committed in his presence, or any felony cognizable under such laws if he has reasonable grounds to believe that the person to be arrested has committed, or is committing any

1. LaPerch and Boylan so testified at the hearing of the motion to suppress, and Judge Dooling so found. At trial, Boylan apparently testified that LaPerch "told Riley not to lie, if he said nothing it could be used against him; but we have been watching him." That this difference in phraseology was only inadvertent is suggested by the fact that on the renewed motion to suppress, after all the evidence was in, counsel for defendants agreed that "the testimony introduced then [before Judge Dooling] is, substantially, the same as introduced today * * * except for one addition." The only additions mentioned were the introduction of statements made after the arrest, and LaPerch's testimony about the actual entry of the apartment.

such felony." 26 U.S.C.A. § 7608(b)(2), (B). Having such "reasonable grounds," the equivalent of "probable cause," see Draper v. United States, 358 U.S. 307, 310 & n. 3, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), an officer may enter the defendant's premises in order to effectuate the arrest.[2]

The legality of the arrest depends, then, upon whether, when entering the apartment,[3] the officers had probable cause to believe that the person to be arrested had committed, or was committing, a felony relating to the Internal Revenue laws. Here the record quite justifies Judge Dooling's conclusion that, at the apartment threshold, as stated in Brinegar v. United States, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949): " 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man

of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 69 L.Ed. 543]," that is, inside was a man who had possessed or still possessed untaxpaid whiskey in violation of 26 U.S.C.A. § 5205(a). The officers had an informer's tip that an illegal still was being operated there,[4] and with an illegal still there is usually a person possessing bootleg whiskey. They had twice seen Riley leaving No. 146–12 with similar heavy packages, at least the second one of which they knew contained such whiskey. They had Riley's statement that he had obtained the whiskey from a man on the second floor of No. 146–12.[5] They had their own observations of intense heat and a mash smell within No. 146–12, increasing as they neared the second floor, and, visible through the open door, the doorway so strangely sheeted for an August evening in Queens.[6] This all furthered the prob-

2. Of course, mere "[b]elief, however, well founded, that an article sought is concealed within a dwelling house, furnishes no justification for a search of that place without a warrant. * * * notwithstanding facts unquestionably showing probable cause" to search. Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145 (1925). This is one reason why "an objective predetermination of probable cause" is usually required, thereby avoiding the "less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." Beck v. State of Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964). Nor can an entry and search be justified as incidental to a lawful arrest remote in time and place. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

3. Defendants do not claim that Price's privacy was invaded as soon as the officers entered the open door to the common hallway, and with good reason. See United States v. Miguel, 340 F.2d 812, 814 (2d Cir. 1965). Thus we need not consider whether probable cause existed at that time.

4. It is true that the informer's reliability was apparently not known when the tip was received, see Wong Sun v. United

States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962); for this reason, the officers quite probably could not have obtained a warrant prior to the events of that evening. See Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). But by the time of the entry, corroboration was supplied by Riley's emergence from 146–12 with bootleg whiskey and by the heat and smell of mash. See United States v. Rivera, 321 F.2d 704, 708–709 (2d Cir. 1963); United States v. Smith, 308 F.2d 657, 662–663 (2d Cir. 1962) (Waterman, J.), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963).

5. As with the informer, see note 4 supra, Riley's reliability was corroborated by the agents' own observations of him that evening, and the suggestion that, although he need say nothing, he should not lie. This, and the greater specificity of the guidance given to the officers, serve to distinguish Riley's information from that given by Hom Way in Wong Sun.

6. While we do not mean to suggest that the open door per se gave the officers more authority to enter than they would otherwise have had, they were unquestionably able to use what it allowed them to see, feel and smell from without. Cf. United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927). In

ability that Riley's supplier was still there tending his still. And corroborating that probability, they had the actions of the woman, suggesting that the still and its operator were inside that apartment. All of this can scarcely be brushed aside as "mere suspicion," Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), or as being "flimsy and * * * unconvincing," Di Bella v. United States, 284 F.2d 897, 905 (2d Cir. 1960) (Waterman, J., dissenting), vacated on other grounds, 369 U.S. 121, 82 S. Ct. 654, 7 L.Ed.2d 614 (1962). The officers had gone from the street to No. 146–12 to apprehend the man who had just supplied whiskey to Riley. Probable cause to believe that he was in the apartment at No. 146–12 increased with every step. It was certainly not diminished by the fact that once within the entryway the officers might also have had probable cause to believe that additional felonies had been or were being committed— the operation of an illegal still—nor by the fact that the location and seizure of the still then became an additional purpose of entering the apartment. Cf. Harris v. United States, 331 U.S. 145, 154–155, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653 (1950). On the contrary, probable cause was strengthened.

It was incumbent upon the agents, if they were to act as law enforcement officers, to follow through while they had every reason to believe that the crime was being committed. If they acted immediately upon all the facts then known to them, it was more than probable that the vendor would be found at the location which Riley had just left. If they had

returned to New York or Brooklyn, waited until the next morning to visit a Commissioner, narrated their story in affidavit form, obtained warrants for arrest and search and seizure and then revisited the scene of their surveillance, it would have been less than probable that the vendor would have been patiently awaiting their arrival. Riley by telephone or otherwise could have given his vendor more adequate notice. Courts should not blind themselves to reality. The narcotics and alcohol vendors do not set up shop in the open market place to dispense their wares. The entry and seizure in these circumstances were not unreasonable.

This is not a case like Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), where the agents brushed aside defendant's wife and little boy to make a forcible entry solely to seize a still. In Jones, as the Court noted, since the agents had been told that Jones was not within, "their purpose in entering was to search for the distilling equipment, and not to arrest * * *" him. 357 U.S. at 500, 78 S.Ct. at 1257. Here, however, the officers were fully justified in believing that they would find within the man from whom Riley had obtained the whiskey.

Nor do we find in this case the "grave constitutional question" that troubled Justice Harlan in Jones. The unknown identity and possible flight demonstrate "why an arrest warrant could not have been sought * * *." Ibid. Moreover, the entry here, unlike that in Jones, was entirely peaceful.[7] The absence of a forcible, fraudulently obtained, or stealthy entry serves to further distinguish this case from cases like Chapman

---

addition, the fact that the door was open, although a still seemed to be presently in operation, would certainly suggest that the man who had possessed Riley's whiskey was still within the apartment.

**7.** Defendants do not claim that the officers' failure to knock and announce their authority and purpose before entering invalidated the entry. Therefore we need not consider whether this entirely peaceful entry through an open door would be

subject to the same requirements as a forcible "breaking," see Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); cf. 18 U.S.C.A. § 3109. Compare Blakey, The Rule of Announcement and Unlawful Entry: Miller v. United States and Ker v. California, 112 U.Pa.L.Rev. 494, 558 (1964), with Ker v. State of California, 374 U.S. 23, 47, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (Brennan, J., dissenting).

v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951 (1932).

Nor is this case governed by Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), although on first blush there are similarities. In that case, one of the elements of probable cause conceded by the government to be necessary was not determinable until the officers had made their entry. The protections of the Fourth Amendment cannot be circumvented by such a justification of an entry. Here, however, probable cause existed without any reference to knowledge gained after the entry.

Reasonable procedures for arrest on probable cause do not always require that the officers know the suspect's pedigree, so that information obtained after entry was not in this case an indispensable element of probable cause. And at the time the officers entered to make the arrest, they could not be assured that Price would be under a blanket in a back room rather than preparing to escape out the back door. It is easy for courts after the fact to hypothesize what might have been done. The crucial inquiry, however, is whether viewing objectively and impartially the facts known to the officers when they acted, their conduct was reasonable. Walking completely peacefully through an open door to arrest a man whom they had reason to believe had just possessed untaxpaid whiskey was assuredly reasonable conduct. Even if, as our dissenting colleague feels (with which speculation we disagree), issuance of an arrest warrant was practicable, the Supreme Court has indicated that practicability is not at all determinative. Compare United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), with Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948). Moreover, it is far from clear that it would have been practicable, even less, wise, for the officers to deploy themselves in a way which would more readily permit the supplier to escape. After all, surveillance of a multiple dwelling in a developed section of Queens is a far cry from guarding an isolated farmhouse or the like in an open field.

As the entry and the arrest were lawful, so were the search and seizure. They saw only what was unavoidable in their pursuit of Price, and they seized only what the most perfunctory search incidental to the arrest of Price revealed. Compare Stanford v. State of Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

## II.

Defendants argue that the two statements by Price and the one by Riley should have been suppressed because they were tainted by the alleged illegality of the entry, arrest, search and seizure. See Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). The argument falls, however, with our conclusion that the entry and arrest were lawful.

They also argue that Price's written statement later that evening and Riley's oral statement the next morning are inadmissible under the holding of Mallory v. United States, 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). Mallory might apply if the officers were shown to have delayed arraignment for the sole purpose of subjecting them to constant interrogation, or had not informed them of their constitutional rights. See Ricks v. United States, 118 U.S.App.D.C. 216, 334 F.2d 964 (1964); cf. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). But this case is quite different. The destruction of the still was imperative and took considerable time, during which there does not appear to have been any interrogation. Nor was there any interrogation while the defendants were left at the local precinct. Although there were some questions asked while defendants were being transported to New York, that time interval would seem unavoidable. The defendants were taken to ATTU headquarters for routine process-

ing that evening. However, the visit did not result in the "unnecessary delay" with which Fed.R.Crim.P. 5(a) and Mallory are concerned. At that hour no Commissioner would have been in his office and "there has been no claim that a commissioner was available" then. United States v. Ladson, 294 F.2d 535, 537 n. 1 (2d Cir. 1961), cert. denied, 369 U.S. 824, 82 S.Ct. 840, 7 L.Ed.2d 789 (1962). Compare United States v. Middleton, 344 F.2d 78 (2d Cir. 1965). Thus, Price's statement was properly admitted against him. The same reasoning applies to the 45 minutes or so during which the complaint was drawn up and Riley made his oral statement, so that statement was also properly admitted against him.

Judgment affirmed.

WATERMAN, Circuit Judge (dissenting).

I respectfully dissent from the affirmance of these convictions, and I would remand for a new trial. Although I do not disagree with the majority opinion in all respect, I do with the greater part of it.

Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) governs here. In that case the police "received information from a confidential informer, who was also a known narcotic user, that unknown persons were smoking opium in the Europe Hotel." Four narcotic agents went to the hotel "and recognized at once a strong odor of burning opium which to them was distinctive and unmistakable. The odor led to Room 1. The officers did not know who was occupying that room." They knocked, identified themselves, were admitted, arrested the room's lone occupant, searched the room, and seized incriminating evidence. Id. at 12, 68 S.Ct. at 368.

In Johnson the Court held that the search had not been conducted pursuant to a lawful arrest. "[T]he arresting officer did not have probable cause to arrest petitioner until he had entered her room and found her to be the sole occupant." Id. at 16, 68 S.Ct. at 370. Moreover, there was no element of hot pursuit "in the arrest of one who was not in flight, was completely surrounded by agents before she knew of their presence, who claims without denial that she was in bed at the time, and who made no attempt to escape." Id. at 16 n. 7, 68 S.Ct. at 370. "Thus the Government is obliged to justify the arrest by the search and at the same time to justify the search by the arrest. This will not do." Id. at 16–17, 68 S.Ct. at 370.

Here, defendant Riley, a person unknown to the arresting officers, but found in possession of unstamped whiskey, told them that he had obtained the whiskey from a "man" on the second floor of 146–12 106th Avenue. The officers went to that address and recognized the distinctive and unmistakable heat and odor their experience prompted them to believe was characteristic of a kitchen-based distillery. These observations led them to the rear dwelling apartment on the second floor. They entered the dwelling apartment without consent, arrested its only occupant, defendant Price, and seized the still in the apartment kitchen.

At no time until they entered his home and found him did the officers know the name, appearance, or background of the "man" who supposedly furnished the unstamped whiskey to Riley, and who was presumably tending the still which the officers discovered after entry into the apartment. Thus, as in Johnson v. United States, supra, one of the elements of probable cause assumed to be necessary was not determinable until the officers had made their entry. Cf. Wong Sun v. United States, 371 U.S. 471, 481 n. 9, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Nor can the precipitous actions of the arresting officers be justified by the need to prevent Price's escape, for at the time of his arrest he was hiding under a blanket, clad only in his underwear, and smiling.

By use of a jeweler's scale with the most delicate of balances one might possibly detect in the facts of this case some flyspeck of probable cause absent from

Johnson v. United States, supra, where the smell was of opium rather than of a brew of corn whiskey, but this is not a fitting occasion for such refined perceptions. Price was arrested in his own dwelling, at 10:30 at night, by officers who had gained entry without his consent, without any announcement, and without an arrest warrant. Moreover, despite the contrary admonitions of my colleagues, there was no justification for dispensing with the appropriate warrants. The officers had had the building under surveillance for several days, and they could assuredly have continued their watch on the rear apartment so as to prevent an escape by any occupant of it or a destruction of the still, during the few additional hours necessary to procure any warrants to which they were entitled. We "should not blind [ourselves] to reality," or worry that, before the officers could obtain warrants, the handcuffed Riley, safely in the physical custody of the officers, would telephone or otherwise warn Price of the impending raid upon the privacy of his home.

Thus the case draws us perilously close to the "grave constitutional question" described by Justice Harlan in Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958):

"[N]amely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment."

Furthermore, as I noted in Di Bella v. United States, 284 F.2d 897, 908–909 (2 Cir. 1960) (dissenting opinion), rev'd on other grounds, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962):

"Rule 41(c) of the Federal Rules of Criminal Procedure, 18 U.S.C., provides that a search warrant shall be restricted to daytime execution unless the affidavit indicates positively that the objects to be seized are upon the premises. * * * In Jones v. United States, 1958, 357 U.S. 493, 498–499 [78 S.Ct. 1253, 2 L.Ed.2d 1514], the Supreme Court stated, by Justice Harlan, that the provisions relative to nighttime search in Rule 41(c) are 'hardly compatible with a principle that a search without a warrant can be based merely upon probable cause.' To be sure, the probable cause the Court was there discussing was probable cause for the existence of objects of seizure rather than probable cause to justify an arrest. But I see no difference in principle between the two situations."

While I do not rely squarely on either of these statements from Jones for this dissent, they at least warn me that, particularly in the circumstances of the present case, we should beware of straining to distinguish relevant Supreme Court definitions of probable cause.

Because Price's arrest was unlawful, the search of his apartment was unlawful as well, and the items such as the corn whiskey malt samples and the remnants of the still (which took an hour for the agents to destroy) seized in the course of that search, as well as the testimony of the agents relative thereto, should not have been admitted as evidence against him. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The statement made by Price just prior to his arrest, which resulted directly from the unlawful search of his apartment, should have been excluded on the same authority, Wong Sun v. United States, supra, 371 U.S. at 484–486, 83 S.Ct. at 415–417, as well as his second statement, made only five and one-half hours later, after he had been held in continuous custody and had been subjected to intermittent interrogation, id. at 487–488, 83 S.Ct. at 417–418.

As for Riley, since he was indicted and tried for possession of the still, he too has standing to object to the admission of the seized items and the officers' testimony relating thereto as evidence against him. Jones v. United States, 362 U.S.

257, 261–264, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). On the other hand, I concur with my colleagues that his statement made the following morning was not improperly admitted against him, for it can plausibly be viewed, not as a consequence of the unlawful arrest and search in Price's apartment, but as the product of Riley's own prior arrest for possession of unstamped whiskey, and of the officers' observations before they entered the apartment, both of which were obtained in an unquestionably valid manner. See Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Furthermore, this statement cannot be excluded on the ground that it was procured in violation of Fed.R. Crim.P. 5(a), for Riley makes no claim that the short period of delay in his presentation, after a commissioner became available, was systematically exploited for the purpose of eliciting a confession from him. Compare United States v. Middleton, 344 F.2d 78 (2 Cir. 1965).