**Elias Quesada SALVADOR, III,**
**Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**Franklin Michael EINFELDT, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**Nos. 74–1309, 74–1310.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 9, 1974.

Decided Dec. 5, 1974.

Steven C. Cross, Des Moines, Iowa, for appellants.

George H. Perry, Asst. U. S. Atty., Des Moines, Iowa, for appellee.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

BRIGHT, Circuit Judge.

Three men participated in the armed robbery of the First Federal State Bank, River Hills Auto Branch, in Des Moines, Iowa, on January 24, 1974. Des Moines police received notification of the robbery and a description of the robbers as black men as the bandits fled the bank. As the result of coordinated efforts, the police pursued the suspects who were fleeing the area of the robbery in an automobile. With the police in close pursuit, these suspects exited their automobile and fled on foot toward an apartment complex in Des Moines known as Arlington Arms Apartments. Police immediately entered the apartment building and ultimately apprehended two of the suspects—the appellants Elias Quesada Salvador, III, and Franklin Michael Einfeldt—in a second floor apartment and apprehended the third suspect, Marcus Louis Howell, as he came out of an apartment on the third floor. All three men were indicted for armed robbery of a bank insured by the Federal Deposit Insurance Corporation in violation of 18 U.S.C. § 2113(d). Howell pleaded guilty while Salvador and Einfeldt jointly stood trial and were convicted by a jury and sentenced to 15 years' imprisonment. Salvador and Einfeldt bring this appeal. We affirm the convictions.

The appellants raise two contentions on appeal:

(1) incriminating physical evidence seized from them when they were apprehended in the second floor apartment of the Arlington Arms and testimony of what the police heard and saw in the apartment should have been suppressed because the warrantless entry violated

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

the appellants' fourth amendment rights; and

(2) the prosecutor made a racial slur in his rebuttal argument to the jury, thereby denying appellants a fair trial in violation of the Due Process Clause of the fifth amendment.

## I.

We will relate the factual setting as it bears on the first issue. Donning ski masks, two of the robbers entered the bank at 3:30 P. M. January 24, 1974. A third man, also wearing a ski mask, manned the getaway car, a dark brown Chevrolet, at the bank's drive-up facility. Howell, who pulled his ski mask over his face as he entered the bank, was subsequently identified by a bank officer who had observed him putting the mask on. The bandits escaped with $9,517, including three packets of "bait money" (paper currency whose serial numbers have been recorded for tracing purposes). As the robbers fled, a teller notified police by a silent bank alarm and a drive-up teller recorded the license plate number of the escape vehicle. As a result of the alarm, police cars converged on streets leading away from the bank. In the meantime, a bank officer telephoned details of the robbery and the description of the bandits and their getaway car to police headquarters. This information was immediately radioed to police cars. Because of the location of a bridge in Des Moines, police expected the robbers to escape on Second Avenue. Two officers in a patrol unit observed a blue Plymouth station wagon enter Second Avenue from Forest Avenue at a high rate of speed and at virtually the same moment also learned over their police radio that the bandits had abandoned their initial getaway car a short distance away. Surmising that the robbers had changed to this car, this police unit began pursuing the blue station wagon.

Several other police cars soon joined in the high speed chase of the station wagon. The vehicle made a left turn against a red light, proceeded west on College Street, and finally turned north on to Arlington Avenue to the Arlington Arms Apartments where the driver attempted to turn into the apartment parking lot. He was unable to negotiate the turn, and the car came to a stop against the guywire of a telephone pole at the entrance to the parking lot of the apartment building. The three occupants left the vehicle and ran toward the apartment building. Police saw at least one of the fleeing men enter the building and assumed that the other two occupants of the car had likewise sought refuge in the apartment building. One of the suspects literally ran out of his shoes, leaving a pair of shoes on the parking lot. Additionally, police observed that the suspect entering the building wore maroon-colored trousers and carried a white sack, presumably containing the stolen money. Only about three minutes elapsed from the robbery to the end of the automobile chase.

The police entered the apartment house and soon concentrated their search on the four apartments on the second floor, where a police officer thought he heard the sound of a door shutting. An officer announced himself as a policeman at the first door, apartment No. 6, but then knocked the door open when he heard the sound of a key chain being fastened. He discovered only a frightened white woman and her children. This lady advised police that a second apartment, No. 5, was unoccupied. Hearing noises from one of the other two apartments on the second floor, the police concentrated their search on the two south-side apartments, Nos. 7 and 8. During this period, several more policemen arrived on the scene. An officer knocked at the door of apartment No. 8 but received no response. He then proceeded to the next apartment, No. 7, knocked on the door, and announced himself as a policeman. Conversation, which had been heard coming from the apartment, suddenly stopped. After a brief pause, the door opened—possibly

from the force of the officer's knocking. This officer and another policeman looked into the apartment and saw a number of black men and a black woman. Several of the men wore maroon-colored trousers and one man was in his stocking feet. The two officers entered the apartment, checked the man without shoes, and found that his feet were dry. One officer proceeded toward the bedroom area and discovered a black man sitting on the toilet. This man, later identified as defendant-Einfeldt, was breathing heavily and sweating profusely. Einfeldt was without shoes and his feet were wet. The officer discovered a second man in the back bedroom also breathing heavily and perspiring. He was bleeding from a cut on his hand and wore maroon-colored pants. A military coat similar to one described as having been worn by one of the suspects lay on the nearby bed. This second man proved to be the defendant-Salvador. These two men were placed under arrest.

The police apprehended the third suspect, Marcus Louis Howell, on the third floor. He had broken into an apartment where he had left the stolen money and was apparently attempting to walk out of the building, but police detained him and thereafter placed him under arrest.

After the arrest of the suspects, the police obtained a consent from the apartment tenant to search the apartment on the third floor which Howell had entered, and police found all of the money stolen from the bank. A subsequent thorough search of apartment No. 7, pursuant to a search warrant, revealed a loaded handgun matching the description of the weapon used in the bank robbery located in the bedroom where the police had apprehended Salvador.

Appellants claim that the policemen unlawfully entered apartment No. 7 and therefore the trial court should have granted appellants' motion to suppress as evidence any article later seized in that apartment and the testimony of what the policemen heard and saw while in the apartment. We assume, only for the purposes of this case, as have the parties, that an illegal entry into the apartment would have required suppression of this questioned evidence.

In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Supreme Court held that a police entry into a dwelling without a warrant may be justified if "exigent circumstances" make the obtaining of a warrant impractical. In *Hayden,* police were informed that an armed robbery had occurred and that the suspect had entered a house just five minutes before the police arrived at the house. The Court explained:

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape. [*Id.* at 298–299, 87 S. Ct. at 1646.]

In Dorman v. United States, 140 U.S. App.D.C. 313, 435 F.2d 385 (1970), the District of Columbia Circuit enunciated six considerations that are particularly relevant in determining whether a warrantless entry into a dwelling by police is reasonable under the fourth amendment. The criteria are:

> 1) that a grave offense is involved;
> 2) that the suspect is reasonably believed to be armed;
> 3) that a clear showing of probable cause exists to believe the suspect committed the crime in question;
> 4) that there is a strong reason to believe the suspect is in the premises being entered;
> 5) that a likelihood exists that the suspect will escape if not swiftly apprehended; and
> 6) that the entry, though not consented to, is made peaceably.
>
> [*Id.* at 392–393.]

The facts in the instant case satisfy each of the *Dorman* criteria: 1) the crime, armed robbery, was obviously a serious crime; 2) one of the suspects brandished a gun during the robbery which had occurred only minutes before the warrantless entry into apartment No. 7 and police could assume that the bandits had retained this firearm; 3) the police possessed strong probable cause to believe the three men who fled into the apartment house had committed the crime; 4) the police believed the suspects had entered an apartment on the second floor of the apartment house, and all other apartments except No. 7 had been checked; 5) the likelihood of escape was apparent; and 6) an officer announced his presence and waited at least a moment before the door swung open, satisfying the peaceable entry criterion.

■ We believe that analogous cases support the thesis that under the circumstances present in the instant case the Des Moines police acted in a reasonable manner. *See* United States v. Holiday, 457 F.2d 912 (3d Cir.), cert. denied, 409 U.S. 913, 93 S.Ct. 246, 34 L.Ed.2d 175 (1972); United States v. Rose, 440 F.2d 832 (6th Cir.), cert. denied, 404 U.S. 838, 92 S.Ct. 153, 30 L.Ed.2d 71 (1971); United States v. De Bose, 410 F.2d 1273 (6th Cir. 1969). *Cf.* United States v. Goldenstein, 456 F.2d 1006 (8th Cir. 1972), cert. denied, 416 U.S. 943, 94 S.Ct. 1951, 40 L.Ed.2d 295 (1974).[1]

Appellants further contend that the police violated Iowa Code § 755.9 (1973), by not announcing the purposes for which they sought admittance to apartment No. 7. Section 755.9 reads:

To make an arrest for any public offense, a peace officer, acting with or, when authorized, without a warrant, may break into a house or other building in which the person to be arrested may be, or in which the officer has reasonable grounds for believing he is, after having demanded admittance and explained the purpose for which admittance is desired.

■ Appellants furnish no citation of Iowa case law supporting this contention. The statute on its face seems to apply only to a forcible breaking and entering of a building or house by a peace officer—a factor absent in this case. Moreover, in construing a federal statute of somewhat similar import, *see* 18 U.S.C. § 3109,[2] the federal courts have held that when exigent circumstances exist, failure to comply with the statute does not render the entry upon the premises unlawful. *See* United States v. Cisneros, 448 F.2d 298, 304 (9th Cir. 1971); Gilbert v. United States, 366 F. 2d 923, 932 (9th Cir. 1966), cert. denied, 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967); Chappell v. United States, 119 U.S.App.D.C. 356, 342 F.2d 935, 937–938 (1965).

## II.

During the prosecutor's rebuttal summation, in response to a statement of Salvador's attorney implying that police arrested the two defendants virtually at random out of several men in the apartment because all of the occupants were black, the prosecutor made the following statement:

At the outset I'd like to make it very clear, and I hope it's been clear throughout the ten days that you've been involved in this matter, that we

---

1. We find the factual circumstances of the cases cited by appellants (listed below) to be clearly distinguishable from the circumstances encountered by Des Moines police at the time of and immediately preceding their entry upon the premises of apartment No. 7. Miller v. United States, 357 U.S. 301, 78 S. Ct. 1190, 2 L.Ed.2d 1332 (1958); Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); United States v. Barrow, 212 F.Supp. 837 (E.D.Pa.1962).

2. 18 U.S.C. § 3109 reads:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

are not here because some police officer reached into a *tree full of blackbirds* and pulled two of them out. (Emphasis added).

At the time of the remark, counsel for the defendants did not object and they did not move for a mistrial. The belief that this statement constituted a racial slur was brought to the trial judge's attention by defendant-Einfeldt after the jury had commenced deliberations. Following the jury verdict, the defendants moved for a new trial because of this alleged racial remark. The trial judge denied the motion and appellants claim reversible error.

Although the record indicates that the prosecutor intended no appeal to racial prejudice, the remark was an unfortunate one and reflects an insensitivity to the feelings of black people.[3] In assessing any potential harm caused by this remark, the trial judge had the following factors to consider:

1) The remark was an isolated comment made during a properly conducted trial lasting 10 days.

2) The appellants' attorney did not object or move for a mistrial at the time of the remark. Einfeldt's attorney explained to the court "I did not move for a mistrial * * * for the reason that * * * I'm not sensitive to that [type of remark], and it passed over me." This statement of Einfeldt's attorney, a white, suggests that the remarks may not have imparted a prejudicial racial connotation to the all-white jury.

3) The Government introduced overwhelming evidence of defendants' guilt.

■ These considerations bear upon whether a prosecutor's improper argument justifies the granting of a mistrial. *See* United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239–242, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Chrisco, 493 F.2d 232, 237–238 (8th Cir. 1974); United States v. Phillips, 482 F.2d 191, 196 (8th Cir.), cert. denied, 414 U.S. 1114, 96 S.Ct. 846, 38 L.Ed.2d 741 (1973); Van Nattan v. United States, 357 F.2d 161, 163 (10th Cir. 1966).

■ Given the broad discretion possessed by trial judges to control closing arguments and to rule on objections to improper argument, *see* United States v. Pruitt, 487 F.2d 1241, 1246 (8th Cir.

---

3. The feelings of the defendants were succinctly summarized by appellant-Einfeldt in a discourse to the court.

Your Honor. When I came to this court room, I came in under my full birthgiven name, which is Franklin Michael Einfeldt. Throughout this trial I have never denied my slave name. When I say slave name, that's the name that the white people give the black people back during the slavery times. The black man took his name from his master when he become a free man. So, when I say slave name, this is what I mean.

    * * * * *

I have but two things which I am proud of, and that is my nationality and my manhood. By using the expression "blackbirds", it can't be interpreted no other way except a derogatory remark, a slang swear expression against my race, my nationality and my manhood. For example, "Oreo Cookie, Spay, Nig, Jig, Boob, Uncle Tom, blackbird." Each and every one of these swear slang expressions are used specifically to discriminate in a derogatory manner against one's nationality as a black man.

Your Honor, the expression "blackbird" can be interpreted no other way than a derogatory remark against my nationality. * * *

Back in slavery days all blacks were considered animals and weren't allowed human names. Therefore, they were usually given the names of animals. Fowls and beasts of burden, such as "Mule, Horse, Cow, Pig, Goat, Hen, Pheasant, Crow, Cock, Peacock," and even "blackbird", as well as others.

Your Honor, Franklin Michael Einfeldt and Mr. Elias Quesada Salvador, III, do not have feathers on our ass nor do we have wings on our back. How can you consider us blackbirds? How else can Mr. Fanter [prosecutor] admit calling Mr. Salvador and me, Franklin Michael Einfeldt, blackbirds any other way than in direct slur, derogatory remarks against us as well as our nationality?

**1354**

1973); Weaver v. United States, 379 F. 2d 799, 802 (8th Cir. 1967), we will not overturn the trial court's ruling on this issue.

Affirmed.