UNITED STATES of America, Appellee,

v.

Wallace JARVIS, Appellant.

No. 850, Docket 76–1487.

United States Court of Appeals,
Second Circuit.

Argued March 10, 1977.

Decided July 26, 1977.

Guy L. Heinemann, New York City, for appellant.

Jonathan M. Marks, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Bernard J. Fried, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before SMITH and FEINBERG, Circuit Judges, and TENNEY,* District Judge.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from a judgment of conviction, after jury trial in the United States District Court for the Eastern District of New York, George C. Pratt, *Judge.* Appellant Jarvis was found guilty of armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d) and was sentenced to five years' imprisonment. His sentence has been stayed pending appeal.

Two issues are raised on appeal. Appellant claims that palmprint evidence and eyewitness identification should have been excluded as fruits of an unlawful arrest and that the eyewitness identifications were impermissibly suggestive. We affirm.

I.

The underlying facts are not in dispute. On February 2, 1976, the European-American Bank at 3121 Thompson Avenue, Long Island City, was robbed at gunpoint by two black males. At the time of the robbery, John DiGiacomo, an employee of the bank, was at a counter in the tellers' area facing a wall decoding a check for a customer. At the same time, Edelmira Morales, a teller, was at her teller's station. One robber vaulted the counter separating the tellers' area from the public area of the bank, landing in the vicinity of DiGiacomo. According to eyewitness testimony, this robber wore a cap pulled down over his forehead and also for a time had a mask pulled over the top of his mouth from below his chin. Brandishing a handgun and a canvas bag, he enlisted DiGiacomo's aid in going to each of three tellers' stations to remove cash from their drawers. While withdrawing cash from the first teller's drawer, DiGiacomo tripped the bank's silent alarm which also activated the two surveillance cameras within the bank.

In the meantime an accomplice obtained the bank guard's gun and controlled the public area of the bank. After the tellers' drawers had been emptied, the first robber again vaulted the counter and escaped from the bank. The accomplice ordered all present to come to the center of the public bank floor, to lie down, and to remain motionless. Shortly thereafter he too left the bank. The entire robbery lasted approximately two minutes.

The Federal Bureau of Investigation and the New York City Police Department immediately commenced an investigation of the robbery. During this investigation, nine latent "lifts" were taken, including a palmprint impression from the top of the tellers' counter. In addition DiGiacomo, Morales and others were interviewed.

Shortly after the robbery, on February 5, 1976, the bank employees were shown blowups of the surveillance film and a "mon-

* Hon. Charles H. Tenney, United States District Judge for the Southern District of New York, sitting by designation.

tage" depicting the two robbers in a dual photograph.

On February 11, 1976, nine days after the bank robbery, Michael Blanchard was arrested on another charge and confessed to the February 2 robbery in Long Island City, indicating he was the accomplice in the public area of the bank. At the time of Blanchard's arrest several documents were seized from him including a slip of paper with the name "Jay" and an address and telephone number which later proved to be that of appellant Jarvis.

On February 12, one Junius Bowman was arrested by state authorities together with another individual, and was found to be in possession of two handguns, one of which was the gun which had been taken from the bank guard during the robbery in Long Island City. Agents of the FBI were notified of the seizure of the gun, and Bowman became a suspect.

On the day of Junius Bowman's arrest, Margaret Bowman, a girlfriend of appellant Wallace Jarvis, and the aunt of Junius Bowman, received a telephone call from her sister Barbara Bowman, Junius' mother, who told Margaret of Junius' arrest while in the possession of some guns. Margaret immediately told Jarvis that her nephew Junius had been arrested with some guns. Upon learning this fact, Jarvis, according to Margaret Bowman's later testimony, admitted to Margaret that those guns were involved in the bank robbery, which he admitted taking part in. Margaret later testified that Jarvis threatened to kill her if she told anyone about the robbery.

On April 8, before Jarvis had been identified as one of the robbers, the government had obtained an indictment charging Blanchard and "John Doe" with violating Title 18, U.S.C. §§ 2113(a), (d) and 2. A "John Doe" warrant issued, but there was no description of this "John Doe" in either the indictment or the warrant.

Eventually, Margaret Bowman told her sister Barbara of Jarvis' threats and on April 14 Barbara decided to approach the FBI. She told FBI Agent Wichner of Margaret's conversation as to the events of the night of Junius Bowman's arrest. Barbara Bowman was shown a spread of six surveillance photographs from different bank robberies by the FBI and identified one of the robbers of the European-American Bank as her sister's friend, Jarvis. The FBI thus first learned of Wallace Jarvis' name on April 14.

Michael Blanchard's wife identified one of the men in the surveillance photo as a man she had seen with her husband a week before the robbery, driving a 1969 four-door Chevrolet in poor condition. Barbara Bowman described Jarvis' car as an old, grey, four-door sedan. A car matching this description was seen by FBI Agent Wichner on April 19 parked at the address written on the paper which had been seized from Blanchard.

On April 19 the information identifying Jarvis was relayed to the U.S. Attorney's office and Jarvis' arrest on the "John Doe" warrant was authorized.

On April 20, 1976 the appellant was arrested in his home shortly after 1 p. m. on the "John Doe" bench warrant which had been issued earlier. The FBI agents making the arrest first telephoned Jarvis' home on a pretext and learned that he was home. They then went to his home, rang the bell, and when no one answered, entered by breaking the door. They found Jarvis in bed with Margaret Bowman and arrested him. A photograph and palmprints were taken of Jarvis following his arrest.

## II.

It is uncontested that these facts, taken together, constituted probable cause to arrest appellant. Appellant alleges, however, that the "John Doe" warrant did not constitute a valid warrant, that a warrant is required to arrest a person in his home if there are no exigent circumstances, and that his arrest was therefore illegal. He further claims that the photograph and palmprint taken from him following his arrest must be suppressed as the fruits of the illegal arrest.

■ The court below held that even though the warrant did not contain a name or description by which the defendant could be identified with reasonable certainty, as required under Rule 4(c)(1), Fed.R.Crim.P.,[1] the warrant was valid because "extrinsic evidence" was available which provided clear, sufficient identification of the defendant. We cannot agree that such extrinsic evidence may be used to validate an otherwise invalid warrant. The warrant requirement exists in order to permit a neutral magistrate to make the decision whether to authorize arrest, rather than leaving this decision up to the prosecutor or officer. *Gerstein v. Pugh*, 420 U.S. 103, 112, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). *Gerstein* and *Johnson* involved determinations of probable cause, but the same principles are applicable here. Even where an indictment has been handed down and there is a presumption of probable cause, a warrant requirement remains. Fed.R.Crim.P. 9(b)(1).[2] If the prosecution were permitted to arrest on the basis of "John Doe" warrants supplemented by extrinsic evidence, the requirement for a particularized warrant, issued by a magistrate, would become a nullity. To comply with Rule 4(c)(1) and the fourth amendment the name or a particularized description of the person to be arrested must appear on the face of the "John Doe" warrant. *West v. Cabell*, 153 U.S. 78, 86, 14 S.Ct. 752, 38 L.Ed. 643 (1894); *United States ex rel. Savage v. Arnold*, 403 F.Supp. 172, 175 (E.D.Pa.1975); *United States v. Swanner*, 237 F.Supp. 69, 71 (E.D.Tenn.1964). We hold that the "John Doe" warrant on which Jarvis was arrested was not a valid warrant.

■ In the absence of a valid warrant, we must decide whether Jarvis' arrest can be upheld without a warrant under 18 U.S.C. § 3052.[3] The Supreme Court has held that 18 U.S.C. § 3052, giving authority to FBI officers and agents to make felony arrests without a warrant is restricted to offenses committed "in their presence" or to instances where they have "reasonable grounds to believe that the person to be arrested has committed or is committing a felony." The statute states the constitutional standard of the fourth amendment that no warrants for either searches or seizures shall issue except "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[4] *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959); *United States v. Elgisser*, 334 F.2d 103, 109 (2d Cir.), *cert. denied sub nom.*, *Gladstein v. United States*, 379 U.S. 879, 85

1. Fed.R.Crim.P. 4(c)(1) provides that
The warrant shall be signed by the magistrate and shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty. It shall describe the offense charged in the complaint.
. . .

2. Fed.R.Crim.P. 9(b)(1) provides that
The form of the warrant shall be as provided in Rule 4(c)(1) except that it shall be signed by the clerk, it shall describe the offense charged in the indictment or information and it shall command that the defendant be arrested and brought before the court or, if the information or indictment charged a minor offense, before a United States magistrate. The amount of bail may be fixed by the court and endorsed on the warrant.

3. The complete text of 18 U.S.C. § 3052 is as follows:
The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

4. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
Fourth Amendment, United States Constitution.

S.Ct. 148, 13 L.Ed.2d 86 (1964). The issue before us is whether under fourth amendment standards it was permissible to arrest Jarvis in his home at midday, following a forcible entry, without a valid warrant particularly describing Jarvis.[5]

The appellant concedes that the government had probable cause to arrest him so that the sole issue is whether or not the arrest was "unreasonable" under fourth amendment standards. In *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), in construing a statute almost identical to 18 U.S.C. § 3052, the Court held that the fourth amendment permits a warrantless arrest based on probable cause pursuant to statutory authority even absent exigent circumstances, but the arrest in question in *Watson* took place in a public area. The Court expressly left open the question "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest." 423 U.S. 418, n. 6, 96 S.Ct. 842. In *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the Court upheld the arrest of a suspect who had been spotted in an open doorway and had then fled into a vestibule. The Court found that the doorway was not a private place and that the suspect had no expectation of privacy. In addition the Court relied on the "hot pursuit" theory of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The Court has not ruled on the validity of warrantless arrests in the home based on probable cause.

■ The government asks us to uphold the Jarvis arrest on the basis of *United States v. Price,* 345 F.2d 256, 259 (2d Cir.), *cert. denied,* 382 U.S. 949, 86 S.Ct. 404, 15 L.Ed.2d 357 (1965), where we upheld a warrantless arrest in a home. *Price* is not controlling. There were exigent circumstances present in *Price* which it has been conceded were not present here. Further, *Price* did not involve a forcible entry. Four circuits have adopted criteria for warrantless arrests in the home first set forth in an *en banc* decision of the District of Columbia Circuit, *Dorman v. United States,* 140 U.S. App.D.C. 313, 435 F.2d 385, 392 (1970).[6] These criteria include commission of a grave offense, belief that the suspect is armed, probable cause to believe the suspect has committed the crime, suspicion that suspect is on the premises, likelihood of escape if delay ensues, and peaceful entry by the police. Under these criteria the Jarvis arrest could not be upheld. The FBI was aware of Jarvis' identity on April 14, but did not even notify the United States Attorney until April 19. The arrest took place on April 20. There would have been ample time to obtain a valid warrant, the government has not alleged that there were exigent circumstances, and the entry was not peaceful. There is therefore serious question whether the forcible entry into Jarvis' home without a valid warrant and in the absence of exigent circumstances meets the requirement of the statute or fourth amendment standards of reasonableness.

We nevertheless decline to suppress the photo and palmprint obtained as the result of the arrest. Had the agents waited outside of Jarvis' home, they could have arrested him, when he emerged, based solely on probable cause. They would then have obtained the palmprints and a photo, the evidence which Jarvis seeks to suppress. The illegal arrest thus was not a "but for" cause for the introduction of the evidence appellant seeks to suppress. *United States v. Galante,* 547 F.2d 733, 742 (2d Cir. 1976) (Kaufman, C. J., concurring).

5. The government argues in its brief, p. 16, that in the absence of a federal statute delineating the authority of the arresting agents, the law of New York should determine the validity of the arrest. Since there is authority for arrest here derived from 18 U.S.C. § 3052, we reject the government's argument. In cases such as *United States v. Swarovski,* 557 F.2d 40 (2d Cir. 1977), the federal statutes did not authorize the agents in question to arrest. The validity of the arrest is governed by federal standards.

6. *Salvador v. United States,* 505 F.2d 1348 (8th Cir. 1974); *United States v. Phillips,* 497 F.2d 1131 (9th Cir. 1974); *United States v. Shye,* 492 F.2d 886 (6th Cir. 1974); *Vance v. North Carolina,* 432 F.2d 984 (4th Cir. 1970).

*Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), in which the Supreme Court required suppression of fingerprints obtained during the illegal detention of a suspect is distinguishable on its facts. In *Davis* there was a wholesale round-up of suspects, and the only link of Davis to the crime was his fingerprints. Had it not been for the illegal detention, his prints would never have been obtained and he would not have become a suspect.[7] By contrast here many clues pointed to Jarvis as a suspect, and no evidence is being challenged which could not have been obtained even without the illegal arrest. Had evidence been seized at the time of the arrest which would not have become available had the police waited for Jarvis to emerge, or had there been no link of Jarvis to the crime except his fingerprints, we might have a different case. But in this case, the failure of the police to wait for Jarvis to emerge was harmless in terms of the photo and fingerprint evidence obtained. *United States v. Santana, supra,* 427 U.S. 44, 96 S.Ct. 2406 (Justice Stevens concurring). This is not a case where the government "exploits" an unlawful arrest by obtaining a conviction on the basis of the very evidence not shown to have been otherwise procurable, which it hoped to obtain by its unconstitutional act. *United States v. Edmons,* 432 F.2d 577, 584 (2d Cir. 1970). Here "the arrest made in good faith turns out to [be] illegal" because the prosecutor failed to insert the known name or description in the warrant. *Id.* at 584.

### III.

Appellant contends that the eyewitness identifications introduced at trial were unnecessarily obtained by impermissibly sug-

gestive means and should therefore have been excluded, citing *Brathwaite v. Manson,* 527 F.2d 363 (2d Cir. 1975) [since *rev'd,* ⸺ U.S. ⸺, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)]. The district court, after an extensive hearing, denied appellant's motion to exclude this evidence.

Appellant alleges that after the witnesses made identifications based on photospreads they were informed by the government agent whether or not their identifications were correct. In addition he objects to repeated showing of the surveillance photographs to the witnesses and to the repeated inclusion of his picture in the photospreads.

■ The identifications here were made by two eyewitnesses to the bank robbery, John DiGiacomo and Edelmira Morales. Both witnesses had an opportunity to observe Jarvis during the robbery. They were shown photospreads on February 23, and again in April, composed of six photographs. DiGiacomo identified Michael Blanchard as one of the robbers in February, and was immediately informed that he had made a correct identification. On April 22, he was again shown a spread, this time containing a picture of appellant. He immediately identified Jarvis as the robber behind the counter and was told that this identification was correct. When he viewed a lineup on April 29, he again identified Jarvis. Since DiGiacomo was certain of his first identification of Jarvis, any error committed by informing him that his identification was correct created no significant likelihood of misidentification by him, even if his identification at the lineup was thus reinforced by the agent's comments. *United States v. Russell,* 532 F.2d 1063, 1067–68 (6th Cir. 1976).[8]

---

**7.** The cases cited by appellant in which evidence was held inadmissible after an illegal search or seizure are all distinguishable. In all of them probable cause was lacking before the search, and the evidence would not have been obtained "but for" the illegal search or seizure. *United States v. Ceccolini,* 542 F.2d 136, 142 (2d Cir. 1976), *cert. granted,* 431 U.S. 903, 97 S.Ct. 1693, 52 L.Ed.2d 386, *United States v. Karathanos,* 531 F.2d 26 (2d Cir.), *cert. denied,* 428 U.S. 910 (1976); *United States v. Bar-*

*ragan-Martinez,* 504 F.2d 1155, 1157 (9th Cir. 1974); *United States v. Edmons,* 432 F.2d 577 (2d Cir. 1970); *Bynum v. United States,* 104 U.S. App.D.C. 368, 262 F.2d 465 (1958).

**8.** Since DiGiacomo had a good opportunity to observe Jarvis during the robbery, his brief exposure to an enlarged surveillance photo prior to his first identification was not impermissibly suggestive so as to require exclusion, if indeed, there is ever any infirmity in showing

Morales identified no one when first shown a photospread, but later selected Bowman's photo as the one most closely resembling one of the robbers. When she was shown a photospread in April, she failed to identify Jarvis, but at a lineup which included Jarvis and Bowman, she identified Jarvis as the robber. At the *Wade* hearing Morales was unable to recall precisely when she had been told that her first identification of Bowman was wrong. In her case there exists a real possibility that her identification of Jarvis in the lineup may have been influenced by the agent's statement that Bowman was the "wrong" man.

█ We do not approve the practice apparently employed here by the FBI of informing potential witnesses of the "correctness" or "incorrectness" of their pretrial identifications. Such practices might well so taint an identification as to require reversal. On the specific facts of this case, however, we hold that Judge Pratt's decision to admit the eyewitness identifications did not constitute reversible error. *Boyd v. Henderson,* 555 F.2d 56, 58 (2d Cir. 1977); *Mysholowsky v. People of State of New York,* 535 F.2d 194 (2d Cir. 1976). This case does not rest exclusively on identification testimony. Other evidence, including palmprints lifted from the tellers' counter linking Jarvis to the robbery was introduced. Margaret Bowman testified to the alleged admissions by Jarvis concerning the robbery and the guns. Junius Bowman testified how he obtained the guns used in the robbery from appellant Jarvis' house where they had been hidden. Both DiGiacomo and Morales were subject to cross-examination at trial, and the defense put on expert testimony on the likelihood of misidentifications. In the light of DiGiacomo's unequivocal identification and the other evidence introduced in this case, any error committed by failure to suppress the identification of Morales was harmless.

· Affirmed.

surveillance photos of the crime itself to witnesses. DiGiacomo selected Jarvis' photo on the first occasion it was shown to him in a spread, and thus was not influenced by the

repeated inclusion of Jarvis in the photospreads, the procedure to which appellant objects.