**UNITED STATES of America**

v.

**David BRIGHTWELL, Thomas Peeks, Stephen Spence, Appellants in Nos. 76–2006, 76–2182 and 76–2222, and Winfield Jones.**

**Nos. 76–2006, 76–2182 and 76–2222.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) May 5, 1977.

Decided Aug. 31, 1977.

Arthur J. Abramowitz, Hyland, Davis & Reberkenny, Cherry Hill, N. J., for appellant, Thomas Peeks.

James J. Rahner, Hickey, Azpell and Rahner, Upper Darby, Pa., for appellant, David Brightwell.

Thomas F. Schilpp, Media, Pa., for appellant, Stephen Spence.

Jonathan L. Goldstein, U. S. Atty., Brian D. Burns, Asst. U. S. Atty., Newark, N. J., for appellee, United States.

Before SEITZ, Chief Judge, ROSENN, Circuit Judge, and LORD, District Judge.*

## OPINION OF THE COURT

PER CURIAM.

The appellants, Peeks, Brightwell and Spence appeal their conviction.

Appellant, Thomas Peeks, makes the following contentions: (1) that the evidence seized from the Brightwell residence was obtained in violation of the Fourth Amendment prohibition against illegal searches and seizures and should have been suppressed by the trial court; (2) the trial of the co-defendant jointly was prejudicial to defendant Peeks and denial of defendant's motion for severance constituted prejudicial error; (3) denial of defendant's motion for change in venue constituted error since defendant was unable to obtain trial by an impartial jury; (4) the pretrial publicity reporting on defendant's trial, as well as on more generalized criminal activity undertaken by identified black groups precluded a trial consistent with standards of due process; (5) the impanelment of an all-white jury was inherently prejudicial to appellant; (6) under the totality of the circumstances of this case, appellant was denied due process and a fair jury trial.

Appellant, David Brightwell, makes the following contentions: (1) that the court erred in sustaining a warrantless entry and search and seizure without a clear showing of probable cause and exigent circumstances; (2) that the court abused its discretion in permitting a witness to make identification by voice analysis without sufficient inquiry into the competency of the witness to testify, especially when the witness' testimony was speculative and was in the nature of an opinion; and (3) that the court erred in refusing to dismiss an impaneled jury which did not properly reflect a cross-section of the community.

Appellant, Stephen Spence, makes the following contentions: (1) that the court erred in refusing to suppress the evidence found in the home of co-defendant David Brightwell on the grounds that same was obtained as a result of an illegal search and seizure, in violation of appellant's rights under the United States Constitution, and permitting said evidence to be introduced against appellant at trial; (2) that the court erred in refusing appellant's requested jury instructions and in failing to instruct the said jury that, although the law authorizes an inference of guilt of theft from possession of recently stolen goods, the jury is not required nor instructed to draw such inference; (3) that the court erred in refusing appellant's requested jury instructions and

---

* Joseph S. Lord, III, Chief Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

in failing to instruct the said jury that, in order to find that the appellant "aided and abetted" in the bank robbery, they must find that appellant had prior knowledge of the robbery; (4) that the court erred in refusing to grant appellant's Motion for Severance prior to trial; (5) that the court erred in refusing to grant appellant's Motion for Acquittal at the close of all the testimony; (6) that the jury verdict was against the weight of the evidence; and (7) that the court erred in refusing to dismiss the charges because of the government's failure to afford the appellant a speedy trial as required by the United States Constitution.

We have examined the record of the joint trial as well as the opinion of the district court and the briefs on appeal. We think such examination supports the conclusion that no error was committed by the district court. We note particularly that the facts found by the district court in its unreported opinion fully support its conclusion that the requisite probable cause and exigent circumstances existed to support warrantless entry and search of the Brightwell residence and the subsequent plain view seizure.

The judgments of the district court will be affirmed.

JOSEPH S. LORD, III, District Judge, dissenting.

Defendants Brightwell, Peeks and Spence appeal their convictions for bank robbery, 18 U.S.C. § 2113(a), and putting lives in jeopardy with a dangerous weapon during that robbery, 18 U.S.C. § 2113(d), citing numerous grounds for reversal. While I find that most of defendants' contentions are clearly without merit, I disagree with my Brethren's conclusion that probable cause and exigent circumstances justify the warrantless entry and search of the Brightwell residence.

Before trial, defendants moved to suppress evidence seized from Brightwell's home. The trial court held a hearing on this motion and in an unreported opinion, dated March 24, 1976, the court ruled that the warrantless entrance of Brightwell's home was justified under the "hot pursuit" doctrine and that once inside the dwelling the warrantless seizure of evidence was supported by the "plain view" exception to the warrant requirement. On appeal the majority has accepted the trial court's analysis.

An understanding of the factual situation leading to the seizure of evidence in Brightwell's residence is essential to the analysis of the hot pursuit exception. The evidence elicited at the suppression hearing and the trial court's findings in its opinion provide the basis of the following summary.

## I. FACTUAL SITUATION

The bank robbery and subsequent seizure of evidence at Brightwell's residence occurred during the afternoon of February 14, 1975. At approximately 12:41 P.M., the Camden Police Department received an anonymous telephone call from a woman who reported that there was a "suspicious" green 1974 Chevrolet Monte Carlo, bearing Pennsylvania license plate 73N726, located in a back alley on the 1200 block of Lake Shore Drive, Camden and that three individuals were in the vicinity acting in a "suspicious" manner. The caller did not describe what she meant by "suspicious." In response to this call, the Camden Police sent a unit to investigate.

At 12:50 P.M. the Camden Police received a call that an armed robbery was in progress at Peoples National Bank in nearby Woodlynne, and that a 1963 Chevrolet was used as the getaway car. A police unit was immediately dispatched to the scene.

At approximately 1:05 P.M. a report was received that a brown 1963 Chevrolet, bearing New Jersey license plate NEW 192 had been stolen from a Pathmark parking lot located approximately one-quarter mile from Peoples National Bank. The police concluded that this stolen automobile must have been used as the getaway car in the bank robbery.

In the meantime, a police unit investigated the report of the suspicious Monte Carlo

in the alleyway in back of Lake Shore Drive and found the stolen Chevrolet, unoccupied, near where the Monte Carlo had been observed. The location of the stolen car was approximately two or three blocks from the bank. The police concluded that the bank robbers had switched from the 1963 Chevrolet to the Monte Carlo to escape.

Investigation at the bank was simultaneously going on during this time period. FBI officers determined that the robbery had been committed by three black males, two of whom were armed. Witnesses stated that one robber wore a pink jumpsuit and two of the robbers were masked. The robbers stole a sum of money and took other articles from the tellers. The FBI also completed a "lookup" of the license plate of the Monte Carlo and determined that the auto apparently was not reported as stolen and was owned by a David Brightwell of 713 East 7th Street, Chester, Pennsylvania.

Based upon this data and the investigations at the bank and Lake Shore Drive, Sergeant Stiles of the Camden Police telephoned the Chester Police between 1:15 and 1:30 P.M. to report the robbery and to request assistance. In particular, Sergeant Stiles told the Chester Police that there had been a bank robbery committed by three persons and that the robbers possibly had switched cars to the green Monte Carlo owned by Brightwell. No further details of the crime were described to the Chester Police.

Captain Steppke of the Chester Police Department coordinated the police action that led to the warrantless search and seizure. Immediately after the call from Camden, Captain Steppke was told of the robbery and possible involvement of Brightwell's auto. He dispatched units at once to stake out the Brightwell residence to determine if the Monte Carlo was there. Captain Steppke then left the station to go to Brightwell's address which was approximately a two minute drive from the police station. On his way he was notified by Officer Coulter, who had arrived at the scene, that the green Monte Carlo was parked near the residence and that a black male was attempting to pull out of the parking space. Captain Steppke told Officer Coulter to stop the driver, Winfield Jones.[1] Coulter then ordered Jones out of the car and frisked him. The officer felt a bulge in Jones' pocket and removed a roll of cash ($215) wrapped in a silk stocking.

During this stop and frisk, Captain Steppke arrived at East 7th Street and directed that Jones be detained in a police car. Steppke then detailed other officers to the front and rear of Brightwell's residence, which was approximately 150 feet from the Monte Carlo. The house is a two-story brick row home with three steps leading to the front door. The blinds were drawn on the front windows. Captain Hamilton and Detective Tyler approached the door of the house, with Captain Steppke a few steps behind. At this point there is a conflict in the testimony.

Captain Steppke testified that Captain Hamilton knocked on the door and Tyrone Alexander appeared at the doorway. Steppke further stated that he heard Captain Hamilton ask permission to enter and Alexander say "come on in" and then opened the door. Captain Steppke maintained during his testimony that defendant Brightwell was not at the doorway and was not the person who gave the officers permission to enter the dwelling.

Detective Tyler, who was immediately next to Captain Hamilton at the doorway, testified to a different encounter. Tyler stated that before he or Hamilton could knock on the door, Alexander exited from the house, leaving the door only partially open. Captain Hamilton and Alexander talked for a moment, but Tyler did not hear Alexander give the officers permission to enter the house. After this exchange between Hamilton and Alexander, Brightwell opened the door. Tyler further testified

---

1. Winfield Jones was a co-defendant and was convicted of the robbery along with these defendants.

that Brightwell, not Alexander, gave Hamilton permission to enter.[2]

Once inside the door and in the living room, the officers could see into the kitchen. They observed a pile of money on the kitchen table being counted by Stephen Spence. A gun was observed on the kitchen floor near Thomas Peeks' feet. Captain Steppke saw Brightwell approaching the stairs, at which point he asked Brightwell to "stand there". After the officers examined the evidence in the kitchen, they placed Brightwell, Peeks, Spence and Alexander under arrest.

While the officers were in the kitchen, they saw a green trash bag which contained pink coveralls and a Peoples Bank bag. Further investigation also revealed a metal coin changer from the bank. It is this evidence along with the money and gun which defendants seek to have suppressed.

At the suppression hearing, Captain Steppke testified about his intentions in approaching the Brightwell residence:

"Q. What was the intention of yourself, Captain Hamilton and the other officers when you knocked on the door?

A. To go into the house.

Q. And, if you were refused permission, would you have went in anyway?

A. *No, sir.*

Q. And, why did you send a man to the back door?

A. *If we'd been refused we would have to have gone for a warrant and would have went in.* With permission we didn't need them so we walked in."

Transcript, Suppression Hearing 88–89 (emphasis added).

Concerning the arrest of defendant Brightwell in his home, Captain Steppke stated:

"Q. When you saw Brightwell walking up the steps, you did not place him under arrest at that point, did you?

A. I didn't say he was walking up the steps. I said he was walking to-

ward the platform leading to the steps.

Q. Did you place him under arrest at that point?

A. No. I told him to stand there and an officer followed me and I told him to keep him.

Q. *When you first saw Brightwell, did you have grounds to place him under arrest?*

A. *The first time, no, I wouldn't say so.*"

Transcript, Suppression Hearing 91–92 (emphasis added).

The government argued before the trial court alternative theories to support the warrantless search of Brightwell's residence. First, it claimed that the officers received consent to enter the dwelling. The trial court did not rule upon this theory but noted that the government's case "suffers from conflicting testimony on a critical point, namely, who gave the consent?" Slip op. at 14 n. 20.

The second theory presented by the government was that probable cause and exigent circumstances justified the entrance based upon the "hot pursuit" doctrine, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and that the discovery and seizure of evidence was justified by the "plain view" exception to the warrant requirements. Although Captain Steppke testified that when he first saw Brightwell, he had no grounds to place him under arrest and also if denied admission, he would have sought a search warrant, the trial court nonetheless found both probable cause and exigent circumstances. The court did note, though, that its decision was "not reached without some difficulty." Slip op. at 16 n. 23. In my judgment, the degree of probable cause and the alleged urgent need for warrantless police action which existed in this case do not arise to the level required to justify a warrantless entrance under the "hot pursuit" doctrine.

---

**2.** Curiously enough, Hamilton himself never testified at the suppression hearing.

## II. HOT PURSUIT EXCEPTION

The Supreme Court has repeatedly noted that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971) *quoting from Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In particular, the sanctity of private dwellings is "ordinarily afforded the most stringent Fourth Amendment protection." *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116, 1130 (1976); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The government has the burden of proving by a preponderance of the evidence, *Lego v. Twomey,* 404 U.S. 477, 488, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the need for a particular warrantless search, *i. e.,* "that the exigencies of the situation made that course imperative." *Coolidge v. New Hampshire, supra* 403 U.S. at 455, 91 S.Ct. at 2032, *quoting from McDonald v. United States, supra* 335 U.S. at 456, 69 S.Ct. 191.

The doctrine of hot pursuit, articulated initially in *Warden v. Hayden, supra,* is one exception to the warrant requirement. A careful analysis of *Hayden* and its progeny demonstrates that in order to qualify under this exception the government must show that before the police entered a premise to arrest a suspect: (1) there existed "not merely the minimum of probable cause, that is requisite even when a warrant has been issued, but beyond that a clear showing of probable cause, including 'reasonably trustworthy information,' to believe that the suspect committed the crime involved", *Dorman v. United States,* 140 U.S.App.D.C. 313, 320–321, 435 F.2d 385, 392–93 (1970); (2) there was strong reason to believe that the suspect was in the premises to be searched, *Government of Virgin Islands v. Gereau,* 502 F.2d 914, 928 (3d Cir. 1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Dorman v. United States, supra* 140 U.S.App.D.C. at 321, 435 F.2d at 393; and (3) there was urgent need for immediate police action because the time delay incident to obtaining a warrant could not be tolerated without increasing the risk of harm to police and bystanders or increasing the risk of escape, *Warden v. Hayden, supra* 387 U.S. at 298, 87 S.Ct. 1642; *Dorman v. United States, supra* 140 U.S.App.D.C. at 319–323, 435 F.2d at 391–95.[3]

### A. Clear Probable Cause.

The requirement of *clear* probable cause to arrest the suspect (as opposed to minimum probable cause) is essential for two reasons: (1) it satisfies the usual condition for any government search or seizure, *i. e.,* mere probable cause; and (2) it is a prerequisite to the analysis of urgent need because the risks of escape or violence which justify this exception are directly dependent upon the police's solidly founded belief that the individual being sought has committed a crime. In those cases recognizing the hot pursuit exception, the pursuing police had strong evidence that the suspect committed a crime, including: (1) eyewitness testimony that the particular suspect was involved in the crime, *Warden v. Hayden, supra; Dorman v. United States, supra;* (2) police pursuit of fleeing individuals following a high speed chase of a getaway car, *Salvador v. United States,* 505 F.2d 1348 (8th Cir. 1974); (3) prior information that the suspect was planning a robbery, *United States v. Holiday,* 457 F.2d 912 (3d Cir.), *cert. denied,* 409 U.S. 913, 93 S.Ct. 246, 34 L.Ed.2d 175 (1972); or (4) arrest warrant issued following a confession of co-conspirators, *Government of Virgin Islands v. Ger-*

---

**3.** In addition to these three requirements, courts have considered whether the police have exhibited respect for the privacy interests protected under the fourth amendment both by minimizing the degree of intrusion of privacy in their searches and by attempting to comply with the warrant requirement. *United States v. Shye,* 492 F.2d 886, 892 (6th Cir. 1974); *Dorman v. United States, supra* 140 U.S.App. D.C. at 321, 435 F.2d at 393.

*eau, supra.* Where the police lacked evidence directly linking the suspect to the crime before the search, the court has rejected the hot pursuit theory. *United States v. Lindsay,* 165 U.S.App.D.C. 105, 506 F.2d 166 (1974). Without strong evidence of criminal involvement, the dangers of violence or escape are too speculative to justify an exception to the clear constitutional mandate that a neutral and detached magistrate determine the need for a search of a premise.

Captain Steppke did not believe that even the ordinary quantum of probable cause existed. Whether the Captain was right or wrong in that conclusion, it is certainly true that the clear probable cause required for hot pursuit was lacking.

Brightwell and the other defendants were not identified as robbery suspects by anyone at the bank and there was no evidence directly linking these defendants to the scene of the crime. The sole connection of these defendants with the robbery was the report that Brightwell's car had been near the place where the getaway car was found. But no one had ever seen Brightwell in the car.

The stop and frisk of Winfield Jones added nothing to this evidence. The money discovered on Jones' person was never connected with the bank robbery. No inference could be drawn from the fact that the Jones money was wrapped in a stocking because the Chester Police did not have a report that the robbers were masked.[4] It would appear that when the police entered Brightwell's house, they were not only looking for Brightwell and other possible suspects, but also the officers were looking for evidence to link these defendants with the crime. The police knocked (or attempted to knock) at the Brightwell door and allegedly paused to converse with the first individual who came out. When Brightwell himself was later seen by officers who knew him, he was *not* immediately placed under arrest. Only after the police entered the house and viewed incriminating evidence were the occupants placed under arrest.

Finally, the statement of Captain Steppke belies the conclusion that the government had clear probable cause to arrest the occupants of the house before the search. The Captain explicitly stated at the suppression hearing that he did not believe that he had grounds to arrest Brightwell when he first saw him. Given this admission and the fact that the government has the burden of proof, the requirement of clear probable cause could only be met if the government could present particularly strong evidence of criminal involvement. That evidence simply does not exist. The facts known to the Chester Police at the time of the entrance in conjunction with Captain Steppke's statement only justifies the conclusion that the police were merely suspicious that Brightwell may have been involved in the robbery. This evidence fails to establish clear probable cause and therefore I conclude that, on this basis alone, the hot pursuit doctrine is inapplicable to this case.

### B. Urgent Need.

The third element of the hot pursuit doctrine, urgent need for warrantless action by the police, requires the government to show that the delay necessary to obtain a warrant is not acceptable because the risks of physical harm to police and others or the risk of escape will increase as a result of such delay. Factual issues relevant to the analysis of these risks are: (1) whether there was a grave crime involved; (2) whether the suspect was armed; (3) whether the suspect knew or might have known that the police were pursuing him; and (4) whether the premises could have been cordoned off while a warrant was obtained.

In this case, the trial court failed to consider: (1) the amount of delay that would have resulted if a policeman at the scene had attempted to obtain a search warrant; and (2) whether there were *increased* risks

---

4. In fact, the robbers were masked, but the Chester Police did not know this.

of escape or physical harm to police and others as a result of this delay. The facts in this case do not demonstrate a situation where these risks instantaneously arose or where the circumstances were dramatically changing with each moment so that any delay in the search was intolerable. Some delay could have been accepted and therefore the extent of the delay necessary to obtain a warrant is important.

The police made no effort to obtain a warrant.[5] The government also failed to present any evidence to show that a magistrate was not available at the time of the search. Since the government has the burden to justify a warrantless entrance, upon this record, there is no possible basis for an assumption that there would have been a significant delay incident to obtaining a warrant.

Given this conclusion, I also find that the record fails to demonstrate that there would have been an increased risk of escape due to a delay in the search. The house was surrounded by the police and the alleged getaway car was under the control of the police. The shades in the front were drawn and there is no evidence to suggest that the occupants knew that the police had stopped defendant Jones. Whatever possibility of escape there might have been was already *in esse*. I fail to see how it could increase if the police had delayed their search to send one of their number to obtain a warrant.

The trial court noted that the area could have been cordoned off but concluded that "[t]he benefits to be derived from obtaining a warrant simply would not have justified [the] additional risk." Slip op. at 15, *quoting from United States v. Bustamante-Gamez*, 488 F.2d 4, 9 (9th Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974). However, in *Bustamante-Gamez* the critical risk was the dan-

ger of injury because the police action had attracted a crowd of neighbors who might have been injured if violence were to erupt. This danger was not present here. In addition, *Bustamante-Gamez* involved the search for contraband which could easily be destroyed. There is no evidence in this case that the police were concerned about the destruction of evidence. In conclusion, I find that there is nothing in the record to prove that a time delay in the entrance of Brightwell's residence would have resulted in a greater risk of escape.

Concerning the risk of physical harm, the record is similarly inadequate to demonstrate that additional risk would result from any delay. A possibility of violence did exist, but this is inherent in apprehending suspects who are believed to be armed. If the suspects were going to resist arrest, the time factor would appear to be irrelevant and the conditions surrounding an approach of the home appeared to be static. The government failed to show that delay would increase the risk of physical harm.

The government's equivocal evidence of urgent need is clearly rebutted by the statement of Captain Steppke at the suppression hearing. It was his opinion that even after announcing their presence to the house occupants, the police would have gone for a warrant if refused admittance. This opinion is consistent with other actions of the police and is not unreasonable in light of the facts known to the police at the time of the entrance.

A court's analysis of the hot pursuit exception must focus upon the reasonableness of an officer's actions in light of the facts known to that officer. It seems incongruous for the government to ignore or contradict the officers' perceptions of urgent need while, at the same time, the government attempts to prove that the actions of those same officers were reasonable. I believe

---

5. The police officers' failure to attempt to obtain a warrant could manifest a lack of concern for the protection of the fourth amendment. Therefore, the court should more carefully scrutinize the action of the police and should apply a stricter standard of urgent need than it would have if the police had attempted to secure a warrant.

that a court should be extremely skeptical of the assertion that there were substantial risks of violence or escape when the persons who are most apt to suffer from these risks do not perceive them. In *United States v. Wilcox,* 357 F.Supp. 514 (E.D.Pa.1973), the court suppressed evidence seized during a warrantless search. In rejecting the government's argument that exigent circumstances existed, the court noted:

"Perhaps the most graphic exhibition of the lack of exigent circumstances, and of the agents' belief that none existed, is Agent Kelly's statement to Mrs. Wilcox that if she did not consent to the search he would get a warrant. . . . If Agent Kelly's statement was honest, it manifested a belief that there was opportunity to seek a warrant." *Id.* at 519.

The evidence presented at the suppression hearing failed to demonstrate the urgency and strong evidence of criminal involvement existing in those cases in which the hot pursuit exception has been applied. Instead, the police consistently appear to have operated under the notion that they were given consent to enter the dwelling. I concur with the trial court that the inconsistencies in the government's testimony as to consent are troublesome, but I conclude that the legality of the action taken by the police must rise or fall based upon a consent theory. Since the trial court has not ruled upon this question, I would remand the case for a determination whether the police were given valid consent to enter Brightwell's home.